John E. HAYES, Plaintiff,

v.

William T. IRWIN and Irwin Trading GmbH, Defendants.

Civ. A. No. C 77-2027 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 4, 1982.

C. B. Rogers, Paul W. Stivers, John Almond, Rogers & Hardin, Atlanta, Ga., for plaintiff.

Henry Hatcher, Hatcher, Dorsey, Irvin & Pressley, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION AND ORDER

VINING, District Judge.

This diversity action concerns the deterioration of a business relationship between the plaintiff and the defendant and the accompanying feelings of bitter resentment and animosity. The action basically concerns an alleged failure to pay sums owing to the plaintiff, tortious interference with existing and prospective business and contractual relations, and defamation. John Hayes contends (1) that he and William T. Irwin were business partners in a commodities trading venture during 1976, (2) that his responsibilities were to solicit and maintain contacts with clients while Irwin was to be responsible for the execution of the clients' trades through one of Irwin's companies; that in 1977 this arrangement ended, (3) that Irwin and Irwin Trading GmbH owe Hayes a substantial amount of money

as a result of this relationship, and (4) that the defendants have engaged in a myriad of tortious activity since the termination of the relationship. Hayes seeks an accounting, actual and punitive damages, and injunctive relief. This case was tried before the court, sitting without a jury, during February and March 1981. The following will constitute the court's findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a).

## Factual Background

John Hayes became a registered commodities broker and a stockbroker in 1970 after working for Shearson Hamill, a stock and commodities brokerage firm. In 1975 Hayes went to work for Loeb Rhoades and Company, where he met William T. Irwin, who was doing some business with Loeb Rhoades. After working in adjoining offices for several months, Hayes went to work for Irwin. He was initially hired as a commissioned salesman for one of Irwin's companies, Irwin Management Company of California (Irwin Management). Subsequently, Hayes was made vice president of Irwin Management and of another of Irwin's companies, Irwin Trading Company (Irwin Trading.) [1]

Hayes' initial responsibility in working for Irwin was in the marketing aspect of the commodities business. Hayes solicited clients to engage in commodities transactions that were to be brokered or transacted through one of Irwin's companies. Irwin was primarily responsible for the actual execution of these transactions, although he also participated in the solicitation of some of the business. Hayes was primarily responsible, however, for the actual solicitation of clients.

When he first went to work for Irwin, Hayes was to receive one-third of the net income to Irwin. This financial arrangement was never utilized, however, since the method of compensation was changed before any business was actually done. Under the second compensation arrangement, Hayes was to receive $6,000 for every $16,000 that was brought into the association between himself and Irwin.[2] This arrangement remained in effect until November 1976.

In his efforts to obtain customers for the commodities business, Hayes initially solicited clients from all over the United States except Miami, Florida. At the time that he and Irwin initially entered into this business arrangement, Hayes was living in California and centered his efforts and solicitation there. Around June 1976, Irwin encouraged Hayes to move to Atlanta, Georgia, to generate business on the east coast. Hayes, a graduate of Georgia Tech and a native of Tennessee, had numerous business contacts and roots in the Southeast, and Irwin was of the opinion that Hayes' efforts at soliciting clients would be very successful in Georgia. Although Hayes did not particularly want to move from California, he did so, moving to Atlanta and setting up an office there, known as Hayes and Associates.[3] Irwin provided Hayes with a telephone credit card along with pamphlets,

---

1. There are four separate entities owned by Irwin which are involved in this dispute. Irwin Management Company of California was used by Irwin for advice on particular commodity transactions. Irwin Trading Company was used to conduct the actual commodity transactions. Irwin Eurotrade Partnership, a broker-dealer foreign partnership, was set up to do "cash and carry" transactions in Europe for American clients. Irwin was the managing partner of this entity, and Hayes was the trustee of numerous grantor trusts that invested in the partnership. Irwin Trading GmbH was a German corporation that conducted commodity transactions in the foreign market. Hayes and Associates, established by Hayes in Atlanta, established ten limited partnerships to invest in Irwin's companies. Hayes himself became a general partner of Irwin Eurotrade Partnership by way of being a trustee of his clients, the revocable grantor trusts.

2. The nature of the association between the parties is a primary area of dispute in the case: Hayes contends that he and Irwin were partners; Irwin contends that they were not.

3. Another dispute in this case is Irwin's steadfast contention that Hayes and Associates was an entirely distinct corporate entity from any of his companies and that he had no responsibilities with regard to the operation of the Atlanta business.

legal forms, and documents to be used in soliciting clients for the commodities investment business. The nature of the business transacted in Atlanta was identical to that transacted in California. Hayes and Irwin were in almost daily contact regarding their business, and once clients were solicited, Irwin set up appropriate accounts and executed the resulting trades through Irwin Trading.

Around the time that Hayes moved to Atlanta, in July 1976, Irwin came to assist in the establishment of the business in Georgia. While in Atlanta, both Hayes and Irwin met with attorneys from the law firm of Cofer, Beauchamp & Hawes regarding the formation, structure, and operation of proposed limited partnerships that were to be used in their investment business. At one of these meetings, Hayes introduced Irwin as his superior; however, Irwin immediately corrected him by stating unequivocally, "No, I'm not John's boss, you know. I'm his partner. We work together." [4] Although the purpose of these meetings with Cofer, Beauchamp & Hawes was to discuss the formation of certain Georgia limited partnerships through which the commodities business would be transacted, they also served as a solicitation for investment from certain of the attorneys at the firm.

Prior to the time of the July meeting, the attorneys at the law firm had filed certificates establishing ten limited partnerships known as Hayes Associates I through X in the state of Georgia which had to be established before June 30, 1976, to qualify for favorable tax treatment. The meetings in July involved the detailing of the structural aspect of these partnerships. During the meetings with the law firm, Irwin gave the attorneys certain tax opinions and drafts of partnership agreements used for similar purposes in California. Subsequent to these discussions and a review of the California limited partnership agreements, the law firm prepared another agreement of limited partnership which was more detailed and longer than the simple certificate filed in June 1976. Hayes and Irwin decided that Hayes should be listed as the general partner on the Georgia limited partnerships and also decided to substitute Hayes as the general partner in the California limited partnerships.[5] After the conclusions of these meetings, Irwin returned to California. His trip to Atlanta in July 1976 was the only time that he ever came to this state.

In August 1976, Irwin decided to form Irwin Trading GmbH, a European corporation, to transact trades in Europe. Irwin Trading GmbH was established with original capital contributions consisting of 20,000 Deutschmarks; 95% of the stock, reflecting a contribution of 19,000 Deutschmarks, was assigned to Irwin, and 5% of the stock was assigned to a foreign individual. Irwin later authorized the transfer of this 5% minority share to himself, with the ultimate result that he owned 100% of the stock of Irwin Trading GmbH. On December 22, 1976, Hayes entered into a partnership agreement with Irwin Eurotrade partnership (Irwin Eurotrade) both individually and on behalf of his clients. The $6,000 that Hayes had originally contributed to Irwin Management, was transferred into a Georgia revocable grantor trust, with Hayes as trustee, that eventually became a partner in Irwin Eurotrade Partnership. At the time of Hayes' entry into this partnership, he was a resident of Georgia. The revocable grantor trusts established for Hayes' clients with Hayes as trustee, were Georgia trusts. Thirty percent of the business done in 1976 apparently was transacted through these revocable grantor trusts, and a substantial amount of business was also done through individual Georgia residents who were involved in the Georgia limited partnerships, established under Hayes and Associates as Hayes Associates I through X.

**4.** Transcript of testimony, Vol. I, p. 54.

**5.** The ten limited partnerships filed in Georgia had approximately thirteen Georgia residents listed as investors. *See* Plaintiff's Exhibit 562.

In November 1976, Hayes traveled to California to meet with Irwin about the hiring of Diane Maddox, a proposed employee to whom Hayes had a substantial objection. At this meeting, Irwin offered to split the profits of the business after subtraction of expenses. This was the first time either Hayes or Irwin had ever formally discussed the establishment of a partnership. (After returning to Georgia, Hayes continued transacting the business as before, as Hayes and Associates.) At this meeting in California, Irwin asked Joan Wilhelm, his secretary, to do an accounting of the business as of that date, and he gave Hayes a copy of this accounting. By one method, Irwin calculated that the business had a loss for the year of $62,000; by another method he showed a loss of $67,000. Irwin then wrote the figures $31,000 and $33,500, as representing 50% of the alleged total loss for the year, depending on the method of calculation. Irwin then told Hayes that these figures represented his 50% share of the loss from the business as it stood at the particular time.

At the November meeting in California there had also been a discussion regarding payment of a referral fee to Mr. Joe Jackson, a resident of Georgia who worked in the same building with Hayes. Jackson, who was involved in oil and gas investments, had referred a number of Georgia clients to Hayes in return for Hayes' referral of certain clients to him. It was agreed at this November 1976 meeting that Jackson would be paid a "finder's fee" equal to 20% of the money invested by the persons he referred. In late 1976 Hayes requested Irwin to wire $14,000 to Jackson for these referrals. Irwin told Hayes to have Jackson open an account in the Bahamas to which funds would be wired. Jackson was to travel to the Bahamas and then give his mother's maiden name and have his passport as proof of his identity when he arrived to collect his money. Jackson acquiesced in this arrangement and went to the Bahamas pursuant to these instructions, but the money was not there. Justifiably irritated, Jackson attempted to contact Hayes but was unable to do so because Hayes was in Europe at this time. Jackson then decided to call Irwin directly, and when Irwin finally returned Jackson's call, he denied that he knew who Jackson was and advised him to look to Hayes for his $14,000. Irwin also told Jackson that Hayes was under investigation by a law firm in San Diego and that he was a defendant in a number of pending lawsuits. Furthermore, Irwin told Jackson that he had never paid any type of referral fee to him and that he knew nothing about any client funds taken in by Hayes. Subsequently, however, Irwin did sign a check for $14,000, drawn on the Irwin Trading GmbH account for the fees owed to Jackson.

In late December 1976 or early January 1977, Irwin told Hayes that he would send him $50,000 as a partial payment of the income he was owed from the business.[6] Irwin promised to wire these funds to Hayes but never did so. Joan Wilhelm, who worked in Irwin's office, had compiled a list of expenses of Irwin Trading and Irwin Management, including some of Irwin's personal expenses. She gave a copy of this list to Hayes when he had been in California earlier in 1976. When Ms. Wilhelm testified that when she told Irwin that she had given Hayes a copy of this expense sheet, he became very upset and stated that he did not want Hayes to have a copy.

In January 1977, Irwin went to London, England, accompanied by Ms. Wilhelm. On or about January 17, 1977, Hayes flew to London to confront Irwin regarding his failure to pay the promised $50,000 and Irwin's failure to account for the profits of the business in 1976. Upon arriving in London, Hayes immediately went to Irwin's

---

**6.** In 1976, Hayes and Irwin did business with clients who invested a total of approximately $750,000, over $350,000 of which was received from the Georgia business. Hayes testified at trial that he has no idea if the $750,000 figure represented the total amount of income generated by the partnership, since Irwin has refused to give him an accounting of the business. This figure is an estimate of the total amount of business in 1976. Approximately 30% of the business was generated through the revocable grantor trusts set up by Hayes in Georgia.

hotel room, who was taken aback by Hayes' presence. When Hayes stated the reason for his visit, Irwin made photostatic copies of four sheets of paper containing figures on worksheets showing the income and expenses for the business operation for the year 1976, which indicated that the business had done poorly because of large expenses, primarily Irwin's. Irwin gave these four sheets of paper to Hayes and told him to go review them so that Hayes would realize that there was not as much profit as he had thought and that he was not entitled to as much payment as he had originally anticipated. After receiving these documents, Hayes reviewed them in his hotel room and realized that the expenses listed by Irwin on the sheets were extremely inflated.[7]

After Hayes' visit to the hotel room, he had a conversation with Joan Wilhelm and, at her request, assisted her in moving from the hotel where Irwin was staying to a different hotel. Ms. Wilhelm stated that she was afraid of Irwin and wanted to get away from him. Irwin located where Ms. Wilhelm was staying, went to her hotel, and told the hotel manager and the police that she had stolen certain papers from him, although he did not press any charges against her. Joan Wilhelm then left England, returned to the United States, and went to work for another company not associated with Irwin.

That same night, as Hayes was in his hotel room, the London police burst into his room with a search warrant and physically removed Hayes from the restroom. The police searched his room, stating that they were looking for certain sheets of paper that Hayes had stolen from Irwin. Hayes insisted that Irwin had given him the four sheets of paper as part of a business relationship, but the police did not believe him and took him to the police station where he was forced to spend the night in jail. He was never officially charged with anything at that time, since under British law the London police could hold him without

charges for a limited amount of time. The next day, Irwin appeared at the police station and identified Hayes as the person who had stolen the sheets of paper from him. It was at this point in time that Hayes was officially charged with the theft of the documents. The London police took Hayes' fingerprints, his photograph, and formally booked him for theft.

Hayes retained a London attorney, and the following week the matter came up for a hearing before a London magistrate. Irwin failed to appear for this hearing, and although the magistrate was extremely irritated, he bound the matter over for yet another week. At the next hearing, Irwin again failed to appear. Hayes' attorney explained to the magistrate that it appeared obvious that Hayes had not stolen the documents and that all charges should be dropped against him. The magistrate then dismissed the charges of theft and taxed the court costs against Irwin. Hayes then returned to Georgia, having been detained in London for approximately three weeks, during which time he was unable to visit any prospective clients or otherwise conduct any business. Furthermore, Hayes was not reimbursed for any expenses incurred in London as the result of the false charges made against him.

Following Hayes' return to the United States, he made a trip to California to hunt down Irwin and confront him about the events that had occurred in London. In yet another incredulous occurrence, Hayes saw Irwin driving along a Los Angeles freeway and pulled him over on the side of the road. Upon seeing Hayes, Irwin immediately burst into tears and apologized profusely for all his prior actions. Irwin assured Hayes that they were still partners together and that he wished to continue the association and begged Hayes' forgiveness. After this emotional reconciliation on the Los Angeles freeway, Irwin finally made arrangements to pay Hayes the $50,000 that had been promised in December. A wire

7. Of the $750,000 figure discussed in footnote 6, Hayes estimated his expenses at approximately $51,000. Irwin's estimated expenses on the four sheets of paper given to Hayes in London amounted to approximately $492,000.

transfer in this amount was made from Irwin Trading GmbH to Hayes' bank account. Although Irwin assured Hayes he was working on a complete accounting of the profits made in 1976, no accounting nor payments were ever made to Hayes.

For the next few months, Hayes assumed that he and Irwin were still in business together as partners and tried to generate business for the year 1977. Hayes continued to solicit business for the Hayes limited partnership arrangements and the revocable grantor trusts through the Irwin Eurotrade partnership.

On June 9, 1977, Hayes received a letter from the law firm of Kilpatrick, Cody, Rogers, McClatchey & Regenstein which stated that the firm had been retained by Irwin in regard to certain claims that Irwin had against Hayes. The letter also stated that Kilpatrick, Cody had been authorized to file suit against Hayes if necessary and requested a meeting with him to explain the business relationship between Hayes and Irwin. Part of the dispute apparently involved the expense sheets prepared by Irwin and the fact that Hayes doubted their veracity. A second letter from the firm, dated August 17, 1977, stated that Irwin apparently claimed that Hayes owed approximately $274,000 to Irwin Trading GmbH. A third letter from Kilpatrick, Cody on August 29, 1977, set forth a breakdown of this figure allegedly due Irwin Trading GmbH from Hayes and the Georgia limited partnerships and advised Hayes not to engage in any transactions on behalf of the California limited partnerships, of which he was a general partner.

In October 1977, an event occurred known as the "anonymous mailing." Every client that did business with Hayes and Irwin in 1976 received an unsigned letter postmarked Washington, D. C. Approximately 30 to 50 of Hayes' clients, most of whom resided in Georgia, received this document indicating that Hayes had questionable business practices and implying that he owed certain amounts of money to Irwin

and was generally dishonest. The letter purported to summarize litigation involving Hayes in San Diego, California, which had grown out of market losses incurred by various clients of Hayes while he was a stockbroker with Shearson, Hayden Stone (successor to Shearson Hamill) and Loeb Rhoades in California. The letter also questioned Hayes' expertise in handling investments and maligned his character. Although Irwin vehemently denied any involvement in either the preparation or actual mailing of this anonymous letter, it is obvious that he was the precipitating force behind it.

When Hayes located a former secretary of Irwin's, Christine Johnson, who testified that he was responsible for the anonymous mailing, Irwin attempted to intimidate her by pressing false charges of theft against her with the Fort Lauderdale police. These allegations were made by Irwin in 1979, shortly before Ms. Johnson's deposition was scheduled to be taken. Furthermore, Joy Hille, one of Irwin's secretaries and the one who was involved in the preparation of the letter, received a $15,000 payment from Irwin shortly before she was to be deposed. In her deposition, Christine Johnson testified that a few days prior to the mailing of these documents, she helped Joy Hille locate a box large enough to mail approximately 50 documents to the Washington, D. C. Post Office. According to Ms. Johnson, Ms. Hille stated that the box was being sent there to be mailed back to individuals in Georgia, and that Irwin appeared to be "very excited" about it. Dr. John Everett Lee, a client of Hayes in one of the Georgia limited partnerships, testified at the trial of this case that when he received the Washington document, he specifically noted the similarity in the typeset on it and the typeset on several documents he had received from Irwin Trading GmbH, which was the company executing the trades on his investments. Of particular note is a letter to Irwin from his counsel in California (Wiles & Circuit) which, excluding the first and last pages, is virtually identical to the

Washington document.[8] These actions by Irwin, coupled with the observation that no one other than Irwin would have been privy to all of the information contained in the unsigned letter, compels this court to find that Irwin in fact either prepared or directed the preparation of the document known as the "anonymous mailing." This letter quite naturally impaired Hayes' ability to attract clients for the business, since the primary commodity for sale in Hayes' business was Hayes himself. If his clients lost confidence in Hayes' ability to return a substantial profit on their investments, they would obviously cease transacting any business with him.[9]

Irwin's attempts to sabatoge Hayes' business did not end with the "anonymous mailing," however. The second method employed by Irwin was the use of telephone calls, both by Irwin directly and by Richard Anderson, his agent.[10] In mid-1977, Irwin had a conversation with Robert Minnear, a certified public accountant with the firm of Touche Ross & Company,[11] the result of which was an investigation by Touche Ross into Hayes' qualifications as a broker/dealer and actions pending against him in California. Simeon Spear, an accountant in Miami, Florida, had previously spoken with Hayes concerning investment opportunities and requested that Hayes send him 8 to 10 subscription agreements for a limited partnership similar to those formed by Hayes in Georgia. After the conversation, Spear called the Touche Ross office in Atlanta to inquire about Hayes and was told that Irwin had revealed certain problems to them about Hayes. Spear then contacted Irwin and after their conversation returned the subscription agreements to Hayes, indicat-ing that his clients did not wish to continue with the investment.

Harry Hickson, an Atlanta tax attorney who had invested in commodities by way of one of the Hayes limited partnerships and who was a recipient of the "anonymous mailing," also received a telephone call from Irwin attacking Hayes' integrity, honesty, and ability to transact business. Dr. Lee, another recipient of the anonymous mailing, received a similar telephone call from Richard Anderson, acting as an agent of Irwin and Irwin Trading GmbH. Anderson told Lee that Hayes could not carry out the transactions that he said he was accomplishing for Lee, that Hayes was using Lee's money for other purposes, and that Lee was being duped into dealing with Hayes.[12] Anderson also admitted that he told Claude LaMontagne, another investor in one of the limited partnerships, that he thought Hayes was dishonest.[13]

Two actions subsequent to the filing of this lawsuit are indicative of Irwin's ongoing scheme to undermine Hayes' business and are illustrative of Irwin's general motive and intent. The first of these actions was a letter dated October 30, 1980, from Irwin, which was sent to six of the ten Hayes Associates limited partnerships established in Georgia. In this letter, Irwin claimed that the trade confirmations received by the clients were false and forged[14] and further charged that Hayes extorted funds from Irwin Trading GmbH and Irwin Eurotrade. Irwin also accused Hayes of attempting to water down the investments of the individual clients and implied that this would result in serious tax consequences.

8. Compare plaintiff's exhibit nos. 568 and 121.

9. Hayes testified at trial that as a result of this unsigned letter maligning his character, he had to completely resell himself to most of his clients "from below ground zero." *See* transcript of testimony, Vol. I, p. 140.

10. Richard Anderson, initially a named defendant in this lawsuit, was previously dismissed for lack of personal jurisdiction by order of March 30, 1979.

11. Touche Ross & Company was the accounting firm that represented one of the Georgia clients doing business with Hayes.

12. Transcript of testimony, Vol. VII, p. 221.

13. Transcript of testimony, Vol. VII, pp. 222–3.

14. This claim is somewhat puzzling, since the execution of trades and their confirmations were done by Irwin or by one of his companies, not by Hayes.

The other action occurred on December 25, 1980, when a lawsuit was filed in California against Hayes by Irwin, based on diversity of citizenship when in fact no diversity existed. The complaint alleged that large amounts of money were owed to Irwin by Hayes and other clients who invested by way of the Georgia limited partnerships.[15] The complaint on its face shows that the court had no diversity jurisdiction;[16] furthermore, Irwin directed the marshal not to effect service. Hayes was made aware of the lawsuit only by a newspaper article. Hayes had previously retained the law firm of Rogers & Hardin to protect his interest in any lawsuit that might be brought against him. Kilpatrick, Cody, which had been threatening to institute litigation against Hayes, had refused to take any action and on December 20, 1977, Hayes had taken the initiative himself and filed this action against Irwin and Irwin Trading GmbH.[17]

The effect of these actions on Hayes—the anonymous mailing, the telephone calls, the October 30, 1980, letter and the fraudulent lawsuit in California—is obvious and substantiated by the evidence presented in this case. Irwin's actions were aimed at the disruption of Hayes' business and his relationships with his clients. Repeated indications of dishonesty and lack of expertise in business by a knowledgeable party have the inevitable result of destroying carefully constructed confidences. As a result of the letters and telephone calls, numerous clients of Hayes refused to continue doing business with him.[18] The ultimate effect of Irwin's actions has yet to be calculated, and this court cannot speculate in that regard.

In his complaint, Hayes contends that Irwin is liable for malicious interference with business relations through his written and telephonic contacts, the anonymous mailing, and the filing of a fraudulent lawsuit in California. Hayes also brings an action for libel and slander pursuant to Ga.Code Ann. Ch. 105–7; a cause of action for false arrest and imprisonment resulting from the events in London; an action for breach of contract and breach of fiduciary duty (1) by failing to report material matters affecting the partnership in general and Hayes' interest specifically, (2) by improperly calling for additional capital contributions to the partnership, (3) by improperly causing a transfer of positions of various partners out of the partnership, and (4) by failing to account for the assets and liabilities of the partnership; an action for fraud or false statements made regarding business expenses; an action for an accounting for the exact amount of profits and losses for the time the parties were in a business relationship; an action for breach of fiduciary obligations; and a claim for actual and punitive damages together with attorney's fees.

■ Irwin contradicts the entire scenario offered by Hayes and contends that neither he nor Irwin Trading GmbH ever transacted business in Georgia and that, therefore, this court has no personal jurisdiction over him or his company. Irwin claims that Hayes voluntarily resigned his positions with both Irwin Management and Irwin Trading and moved to Georgia of his own accord, setting up Hayes and Associates as a sole proprietorship in which Irwin had no interest. Irwin denies that he encouraged Hayes in this venture and denies that he

---

15. This court notes with interest that this claim by Irwin was never made the subject of a counterclaim in the present action; as a claim arising out of the same transactions or occurrences as the main claim, it would also have been a compulsory counterclaim pursuant to Fed.R.Civ.P. 13(a).

16. Plaintiff's exhibit no. 562.

17. Hayes has obtained a default judgment against Irwin Trading GmbH.

18. Some of the clients who ceased doing business with Hayes because of Irwin's communications included Dr. John Everett Lee, Simeon Spear, Lamar Gammage, Frank Young, C. B. F. Young, James Young, Charles Young, Don Shula, Charles Morgan, Joseph Denson, and James Hudson. Harry Hickson, although he did not cease doing business with Hayes, remarked "[E]very time you get a call, every time you get a piece of literature that's negative, it does have an effect." Transcript of testimony, Vol. III, p. 120.

was ever involved in any way with Hayes' business in Georgia. He claims that Hayes did not need to obtain permission for him to conduct the transactions that were made through Hayes and Associates and that Hayes was under no obligation to accomplish trades by way of Irwin Trading. Irwin claims that his only visit to Georgia occurred in June or July 1976 and admits that he met with attorneys for Cofer, Beauchamp & Hawes at Hayes' request but denies that he solicited any business for Irwin Management or discussed the formation of any partnerships that were to be set up on behalf of the Irwin companies. He denies having any role in the creation of these limited partnerships or revocable grantor trusts which ultimately transacted business through Irwin Trading. Irwin vehemently denies that any partnership existed and denies that he has had sufficient contacts with the state of Georgia that would invoke this court's jurisdiction over him. At the trial of this case, Irwin attempted to introduce the defense that Hayes failed to register any of the securities that arose out of the transactions in this case with the Securities Exchange Commission, a defense which this court disallowed.[19]

The resolution of this rather bizarre situation requires an initial determination of two crucial issues: (1) Did a partnership or agency relationship exist between Hayes and Irwin in 1976 and, if so, (2) were there

sufficient contacts by Irwin with the state of Georgia to invoke personal jurisdiction under Georgia's Long Arm Statute, Ga. Code Ann. § 24–113.1? The answer to each question is yes; Irwin must be held accountable for his reprehensible conduct. This court will (1) initially examine the nature of the relationship between Hayes and Irwin, (2) discuss the applicable principles of jurisdiction as to each separate count of the plaintiff's complaint, (3) determine liability under each separate count of the complaint, and (4) assess the appropriate damages.

## I. THE RELATIONSHIP BETWEEN HAYES AND IRWIN

The initial task before this court is to resolve the issue regarding the nature of the business relationship between Hayes and Irwin. Hayes contends that he and Irwin were partners in their investment business as a result of an agreement entered into by both parties in November 1976. Irwin steadfastly denies that any partnership existed and claims that Hayes is not entitled to any of the profits of the enterprise. This issue of the existence of a partnership is especially relevant to Counts 4 and 5 of Hayes' complaint, in which he seeks an accounting of the business and one half of the profits.

19. Fed.R.Civ.P. 8(c) enumerates certain matters that must be pled as affirmative defenses, although the matters listed are illustrative only. Where the matter under consideration is not expressly covered by Fed.R.Civ.P. 8(c) and the court is not aware of either state or federal law deciding the issue, such as the defense offered in this case, general principles must be considered: (1) whether the matter to be pleaded can be said to constitute a necessary ingredient of the plaintiff's cause of action or is, on the contrary, extrinsic to that cause of action—a new matter which will bar an otherwise meritorious claim for relief—and (2) fairness as to problems of proof. The longer the period of unexplained delay in asserting an affirmative defense, the less that will be required of the non-moving party in showing prejudice.

Neither Fed.R.Civ.P. 8(c) nor Ga.Code Ann. § 81A–108(c) specifically enumerates violation of securities laws as an affirmative defense; however, this court concludes that it should

have been pled as an affirmative defense and that the defendant's attempt to bring it up at trial was too late. In determining that securities violations are to be an affirmative defense, this court adopts the reasoning set forth in *General Teamsters v. Lawrence-Mercer County Builders Ass'n.*, 88 F.R.D. 644 (W.D.Pa.1980). There, the court adopted the "logical relationship" test, under which a relationship exists among multiple claims when they involve the same factual or legal issues or when claims derive from the same basic controversy between the parties. Applying that test, the court finds that Irwin's contention that Hayes violated the securities laws clearly derives from the same factual background surrounding this case and should have been pled in his answer. Since it was not and since the defendant failed to provide an acceptable reason for that failure, this court will not entertain that defense when it is finally asserted at trial.

414

Before determining whether a partnership existed, the court is faced with a choice of law problem: Does California law or Georgia law apply? The alleged agreement to split profits occurred in California; Hayes is a resident of Georgia; Irwin was a resident of California; and Hayes' business was established in Georgia.

■ The law in diversity actions involving conflict of laws problems is that substantive legal issues must be resolved by the forum state's conflict of law rules. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since Georgia is the forum state, its conflicts rules governing contracts and the resulting rights of the parties must be followed. Hayes maintains that the Georgia courts would apply California law, since the conflict rule of "lex loci contractus," or the law of the state where the contract is entered into, governs the rights of the parties in the case *sub judice*. *Pink v. A. A. A. Highway Express, Inc.*, 191 Ga. 502, 13 S.E.2d 337 (1941). This is the applicable rule when the issue is solely a matter of interpretation of the contract; however, when a contract is made in one state and is to be performed in another state, the law of the latter state will govern as to the validity, nature, obligation, and construction of the contract. *Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571 (5th Cir. 1981), *see also Goodman v. Nadler*, 113 Ga.App. 493, 148 S.E.2d 480 (1966). Although the place where the contract is entered into is an important factor to be weighed, it is not the exclusive consideration; if the parties contemplated at the time of the making of the contract that the contract would principally have effect in another state, that latter state's law will apply. *Old Hickory Products Co. v. Hickory Specialties, Inc.*, 366 F.Supp. 913 (N.D.Ga.1973); *Herschfeld v. Dexel*, 12 Ga. 582 (1853). It is also the rule in Georgia that the determinative location is not where the contract is entered into or executed but where the last act essential to its completion is located or where the contract is delivered as consummating the agreement. *Residential Industrial Loan Co. v. Brown*, 559 F.2d 438 (5th Cir. 1977); *Robinson v. Ravenel Co.*, 411 F.Supp. 294 (N.D.Ga.1976). *See also Peretzman v. Borochoff*, 58 Ga.App. 838, 200 S.E. 331 (1938).

■ It is true that the investment business in this case was not performed in Georgia alone and that the agreement was entered into in California, where Irwin was a resident. However, this court is also influenced by other factors which indicate that Georgia law should apply: Hayes, as part of the agreement, established and maintained his office in Georgia; Hayes became a resident of Georgia; the limited partnerships and revocable grantor trusts set up to do business with him and Irwin were established under Georgia law; Hayes' clients and the investors were from Georgia as opposed to California; and the effects of the anonymous mailing and telephone calls by Irwin were realized primarily in Georgia. Weighing the various factors, the court finds the balance of the agreement between the parties occurred in Georgia, not California. The effects of Irwin's acts on its residents give the state of Georgia an interest in remedying the harm done, and although the Georgia courts have not officially adopted the more modern "governmental interest" theory of conflicts, this court is persuaded that they would do so given the situation presented in this case. Accordingly, Georgia law will apply to the resolution of this issue of the existence of a partnership between the parties.

With respect to the formation of partnerships, Ga.Code Ann. § 75–101 provides:

A partnership may be created either by written or parol contract, or it may arise from a joint ownership, use, and enjoinment of the profits of undivided property, real or personal.

Furthermore, Ga.Code Ann. § 75–102 provides:

A joint interest in the partnership property, or joint interest in the profits and losses of the business, shall constitute a partnership as to third persons. A common interest in profits alone shall not.

These provisions, however, are not exhaustive of what may create a partnership between two persons. Given the variety of relationships that have been deemed to be partnerships, it is difficult, if not impossible, to formulate an all-encompassing definition of partnership. Generally speaking, a partnership is a voluntary agreement between two or more persons to contribute their money, property, or skill to the operation of a joint business or common enterprise for their common benefit and to divide the profits and bear the losses in certain proportions. *See Floyd v. Kicklighter*, 139 Ga. 133, 76 S.E. 1011 (1912); *Escoe v. Johnson*, 110 Ga.App. 252, 138 S.E.2d 330 (1964); *Russell v. Strain*, 69 Ga. App. 654, 26 S.E.2d 460 (1943). A partnership may be created for a single venture or enterprise. An agreement to form a partnership need not be in writing, for the true determinant of a partnership is the objective intent of the parties involved. The language which is used is a primary factor in determining the intent of the parties with respect to any agreement, and when ascertained, it will prevail over all other considerations. *Chalkey v. Ward*, 119 Ga. App. 227, 166 S.E.2d 748 (1969). *See also Kennedy v. Thruway Service City, Inc.*, 133 Ga.App. 858, 212 S.E.2d 492 (1975).

It is true, as Irwin maintains, that an agreement to share profits does not automatically create a partnership. *Floyd v. Kicklighter, supra.* If other circumstances show that the parties did not intend to create a partnership, none is created. Determinative factors of a partnership include an agreement to share profits and losses, a joint enterprise, a joint risk, a joint sharing of expenses, a joint right of control over the business, and joint ownership of capital. These factors, taken alone, may not be sufficient to create a partnership, but the presence of several of them creates a strong presumption in favor of a partnership.

Irwin maintains that since neither he nor Hayes had any control over the other's activities, since he only dealt with Hayes in a representative capacity from each of his separate entities as opposed to an individual capacity and since Hayes was a mere "independent contractor" as opposed to a partner or agent, he could not have been Hayes' partner. This court agrees that certain of the facts in this case indicate that a partnership arrangement did not exist: (1) There was never a formal agreement to form a partnership. (2) Even after the November 1976 meeting, in which Irwin offered to split the profits, the nature of the business did not change: Irwin continued to transact trades by way of his separate entities; Hayes continued to solicit new clients for investment purposes as "Hayes and Associates." (3) The offices in Atlanta and California always remained separate entities and were never organized under the name "Hayes and Irwin." (4) Furthermore, Hayes classified his business as a "sole proprietorship."

It appears from the totality of the circumstances, however, that a partnership did exist between the parties in this case. It was Irwin himself who stated to the attorneys at the July 1976 meeting, "No, I'm not John's boss. I'm his partner. We work together." In November 1976, it was Irwin who suggested that they split the profits fifty-fifty and told Hayes to draw up a list of his yearly expenses for the business so his one-half share could be calculated. Irwin also drew up an expense sheet in anticipation of calculating his share of the profits, although it appeared to be extremely inflated. To maintain that the business run by Hayes and Irwin was distinct and entirely separate is to ignore the reality that Hayes and Irwin were inextricably involved with each other in a common enterprise of soliciting and transacting investments for various clients. Hayes' responsibility was to solicit the clients; Irwin's was to transact the trades, completing the business that Hayes had initiated. Their daily telephone conversations concerning the business and the receipt by Hayes of correspondence, trading confirmations and account statements relating to the business are also evidence that the two parties were acting in concert. The court is persuaded from the objective acts of the

parties that a partnership was created as early as July 1976, when Irwin held himself out as being Hayes' partner. *See Woods v. Allied Concord Financial Corp.*, 373 F.2d 733 (5th Cir. 1967) (if a person holds himself out or permits himself to be held out to the world as a partner in a business, he will be bound for any partnership contracts and will be estopped from denying his connection with the partnership.)

This court is not persuaded by Irwin's arguments that Hayes was a mere independent contractor or that Irwin never dealt with Hayes in an individual capacity. The evidence presented at trial compels the conclusion that a partnership existed between Hayes and Irwin for the purpose of soliciting clients and transacting their investments. Since a partnership existed, the court must next determine if it transacted business in Georgia and had sufficient contacts with Georgia that would allow a proper exercise of *in personam* jurisdiction over Irwin.

## II. JURISDICTION

*In personam* jurisdiction in this case is predicated on Georgia's Long Arm Statute, Ga.Code Ann. § 24–113.1, which provides:

A court of this state may exercise personal jurisdiction over any nonresident, or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use or possession enumerated in this section, in the same manner as if he were a resident of the State, if in person or through an agent, he:

(a) Transacts any business within this State; or

(b) Commits a tortious act or omission within this State, except as to a cause of action for defamation of character arising from the act; or

(c) Commits a tortious injury in this State caused by an act or omission outside this State, if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; or

(d) Owns, uses, or possesses any real property situated within this State.[20]

On March 30, 1979, prior to the trial of this case, the Honorable Newell Edenfield entered an order denying Irwin's motion to dismiss for lack of personal jurisdiction but indicating that a finding of jurisdiction was impossible absent a resolution of the business relationship issue and further development of the facts. Judge Edenfield did hold that Count 1 (malicious interference with business relations) and Count 2 (defamation) could not be based on subsection (b) of Ga.Code Ann. § 24–113.1.[21] He reserved any ruling on the applicability of subsection (c), since numerous issues of fact remained. He did remark, "[I]t appears to this court that defendant Irwin has engaged in a persistent course of conduct such that personal jurisdiction can properly be premised on subsection (c)." Irwin maintains that this court has no jurisdiction over him under any subsection of Georgia's Long Arm Statute since he made only one trip to this state, in July 1976, and his contacts with this state were limited to some telephone calls and letters to Hayes. Any exercise of jurisdiction, Irwin contends, would offend traditional notions of fairness and due process since he did not have the requisite minimum contacts with the state.

In a diversity case, a federal court may exercise *in personam* jurisdiction over a nonresident defendant only to the extent permitted by the long arm statute of the forum. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1933); *Gold*

---

**20.** Subsection (d), dealing with the ownership, use or possession of real property in the state has no applicability to this case. The relevant portions of the Long Arm Statute with respect to the instant case are subsections (a), (b), and (c).

**21.** Judge Edenfield reasoned that Count 1 was merely another name for defamation (Count 2), and Ga.Code Ann. § 24–113.1(b) specifically excludes defamation as a cause of action which may be brought.

*Kist Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375 (5th Cir. 1980); *Attwell v. LaSalle National Bank*, 607 F.2d 1157 (5th Cir. 1979). Furthermore, it is a well accepted principle of law that a nonresident defendant is subject to the jurisdiction of the court in the forum state only if he has established minimum contacts in the state so that the exercise of jurisdiction is consistent with traditional notions of fair play and substantial justice. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See also Clarkson Power Flow, Inc. v. Thompson*, 244 Ga. 300, 260 S.E.2d 9 (1979); *Timberland Equipment Ltd. v. Jones*, 146 Ga.App. 589, 246 S.E.2d 709 (1978). The Long Arm Statute enacted by the Georgia legislature contemplates that jurisdiction is to be exercised over nonresident parties to the maximum extent permitted by procedural due process. *Clarkson Power Flow, Inc. v. Thompson*, 244 Ga. 300, 260 S.E.2d 9 (1979); *Coe & Payne Company v. Wood-Mosiac Corp.*, 230 Ga. 58, 195 S.E.2d 399 (1973). In order to satisfy the constitutional requirements of procedural due process, it must be shown that a non-resident defendant has some "minimum contact" with the state of Georgia so as to make the exercise of jurisdiction reasonable and fair. *Hollingsworth v. Cunard Line Ltd.*, 152 Ga.App. 509, 263 S.E.2d 190 (1979); *Timberland Equipment Ltd. v. Jones*, 146 Ga.App. 589, 246 S.E.2d 709 (1978). Before the court addresses the applicability of the Long Arm Statute to the case at bar, a brief examination of the three relevant subsections and the policies behind them is in order.

▮ Subsection (a) authorizes a court to exercise *in personam* jurisdiction over a nonresident defendant if that defendant "transacted any business within the state." In construing subsection (a), the Georgia Supreme Court set forth a three-part test to enunciate its parameters: (1) the nonresident defendant must purposely do some act or consummate some transaction in the state; (2) the cause of action must arise from or be connected with the act; and (3)

the exercise of jurisdiction by the Georgia court must not offend traditional notions of fairness and substantial justice. *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 198 S.E.2d 285 (1979). *See also Lyons Manufacturing Co. v. Gross*, 519 F.Supp. 812 (S.D.Ga.1981). The trend in construing long arm "transacting any business" statutes is to interpret them most liberally and to uphold the jurisdiction of the court for the plaintiff's residence and actions arising, either directly or indirectly, out of such transactions. *Davis Metals, Inc. v. Allen, supra; Hollingsworth v. Cunard Line Ltd., supra.*

▮ In accordance with this trend, subsection (b) of the Long Arm Statute was initially interpreted by the Georgia appellate courts in accordance with the so-called New York rule: In order for jurisdiction to attach, both the tortious act or omission and the injury must have occurred in Georgia. *Castleberry v. Gold Agency*, 124 Ga.App. 694, 185 S.E.2d 557 (1971); *O'Neal Steel, Inc. v. Smith*, 120 Ga.App. 106, 169 S.E.2d 827 (1969). The Georgia Supreme Court later rejected this view in *Coe & Payne Co. v. Wood-Mosiac Corp., supra*, adopting instead the so-called Illinois rule: Jurisdiction may attach under subsection (b) when an injury occurs in Georgia resulting from a tortious act or omission outside Georgia. In rejecting the constrictive rulings of *Castleberry* and *O'Neal Steel*, the Georgia Supreme Court reasoned that the expansive reach of Georgia's Long Arm Statute was prefaced by a desire to protect Georgia's citizens from tortious acts which might occur outside the state, the effects of which would be realized within the state. The foundations of jurisdiction, the supreme court has reasoned, include the interest that a state has in providing redress in its own courts against persons who inflict injuries upon, or otherwise incur obligations to, those within the ambit of the state's legitimate protected policy. The limits on the exercise of jurisdiction are not mechanical or quantitative but are to be found in the requirement that the provisions made for this purpose must be fair and reasonable in the circumstances and must give the de-

fendant adequate notice of the claim against him and an adequate and realistic opportunity to appear and be heard in his defense. *Coe & Payne Co. v. Wood-Mosiac Corp.*, 230 Ga. at 61–62, 195 S.E.2d 399. This liberal rule must, of course, be tempered with discretion. One example of this discretion may be found in *Shellenberger v. Tanner*, 138 Ga.App. 399, 227 S.E.2d 266 (1975), where the court stated:

> When a nonresident engages in some activity with or in the forum, even a significant single transaction, whether he be physically present there or not, and as a result business is transacted or a tortious injury occurs, a jurisdictional "contact" exists between that nonresident and the forum. But when the unilateral actions of a forum plaintiff merely involve or somehow relate to a nonresident who has in no way conducted some activity with the state, there may be a "connection" between the nonresident and the plaintiff. But there is no "contact" between the nonresident and the forum such that jurisdiction will lie.

138 Ga.App. at 408, 227 S.E.2d 266.

The court went on to specifically hold:

> [T]he mere allegation that as the result of an act or omission by a nonresident outside the state and injury has occurred to a Georgia plaintiff does not establish a "contact" with this forum in the absence of an implicit or explicit showing of activity with or in Georgia by the nonresident.

138 Ga.App. at 410, 227 S.E.2d 266.

■ While the *Coe & Payne* court judicially engrafted an "act without/injury within" jurisdictional rule onto subsection (b), the Georgia legislature had enacted a version of the same rule. Subsection (c), enacted in 1970, confers personal jurisdiction over a nonresident tortfeasor who causes injury within the state by an act or omission outside the state if he "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." Therefore, a rule conferring jurisdiction over nonresident tortfeasors committing tortious acts or omissions outside the state which cause injury within the state exist judicially under subsection (b) and legislatively under subsection (c). The enactment of subsection (c) does not modify the Georgia appellate court's extension of subsection (b) to provide a basis for securing jurisdiction over one who commits an act outside the state which causes injury within the state. *Atlanta Coliseum, Inc. v. Carling Brewing Co.*, 411 F.Supp. 253 (N.D. Ga.1976).

■ Thereafter, the Georgia Court of Appeals undertook a comparative analysis of subsection (b) in light of subsections (c) and (a). *Shellenberger v. Tanner, supra.* With respect to subsection (c), the *Shellenberger* court noted that a nonresident tortfeasor, in addition to doing purposeful activity in the state, must have one of the additional "contacts" with the state listed in subsection (c). Since jurisdiction under subsection (b) should be no less reasonable and no less in accordance with traditional notions of fair play and substantial justice than jurisdiction under subsection (c), the *Shellenberger* court formulated the following tripartite test for subsection (b) *in personam* jurisdiction: (1) the nonresident must purposely avail himself of the privilege of doing some act or consummating some transaction with or in the forum, (2) the plaintiff must have a legal cause of action, and (3) if the first two requirements are met, the exercise of jurisdiction over the nonresident must be reasonable. 138 Ga.App. at 407, 227 S.E.2d 266. Therefore, the *Shellenberger* court rejected a prior implicit construction of subsection (b): "A mere demonstration that an injury has occurred [in Georgia] due to an act or omission by a non-resident outside this forum does not necessarily show that the defendant had such contact with Georgia to confer jurisdiction over him." 138 Ga.App. at 409, 227 S.E.2d 266.

In 1979, the Georgia Supreme Court seemingly eliminated any analytical distinction between subsections (b) and (c) in holding that limitations similar to those present in subsection (c) were constitutionally man-

dated under subsection (b). *Clarkson Power Flow, Inc. v. Thompson*, 244 Ga. 300, 260 S.E.2d 9 (1979). Thus, it appears that to confer jurisdiction over a nonresident under subsection (b), the non-resident's purposeful activity in the forum must be of a nature similar to the "contacts" described in subsection (c).

With these general principles in mind, this court must now examine each count of the plaintiff's complaint and determine if the jurisdictional prerequisites of Ga.Code Ann. § 24–113.1 are satisfied.

## A. Count 1

### (Tortious Interference with Business Relations)

In his order dated March 30, 1979, Judge Edenfield determined that personal jurisdiction under this count must be based on subsection (c) of the Long Arm Statute [22] leaving for this court the decision of whether Irwin had pursued a course of conduct sufficient to bring him within the parameters of Ga.Code Ann. § 24–113.1(c). The acts complained of in this count include the anonymous mailing sent to Georgia clients for the purpose of maligning Hayes and the telephonic communications with Hayes' clients and accountants in Georgia. These acts are also the basis for Count 2 of the plaintiff's complaint alleging defamation, and Judge Edenfield determined that Count 1 was merely a different name for Count 2. This court disagrees with Judge Edenfield's conclusion in this respect, since a cause of action for defamation may be brought pursuant to Ga.Code Ann. § 24–113.1(b), as discussed in Part B, *infra*. While Hayes' cause of action might be brought pursuant to subsection (b) jurisdiction, this court is persuaded that jurisdiction pursuant to subsection (c) is more appropriate with respect to a charge of interference with business relations.

The plaintiff was at the time of the acts in question, and remains, a Georgia resident, the locus of whose business is in the state of Georgia. It is true that residency of the plaintiff alone is not sufficient to invoke jurisdiction, *Fowler Products Co., Inc. v. Coca-Cola Bottling Company of Tulsa, Inc.*, 413 F.Supp. 1339 (M.D.Ga.1976), but this court is persuaded that Irwin had numerous contacts with Georgia so that jurisdiction is properly invoked.

The evidence presented at the trial of this case revealed that Irwin made a crucial trip to Georgia in 1976 to negotiate the establishment of the investment business in Atlanta, gave Hayes a telephone credit card, pamphlets, and other material to assist in the formation of Hayes Associates I through X, was in almost daily contact with Hayes regarding the running of the business, received and sent letters to the law firm of Cofer, Beauchamp & Hawes and solicited clients from members of the firm for the Georgia limited partnership, and by way of his company, Irwin Trading, executed the trades on Hayes' clients' investments. Furthermore, Hayes and Associates was a partner in another Irwin company, Irwin Eurotrade Partnership. It was Irwin who encouraged Hayes into moving to Georgia so that their commodities investment business could expand. These acts indicate Irwin purposely availed himself of the privilege of conducting activities within the state of Georgia. *See Hanson v. Denkla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

It was Irwin who promoted the establishment of the commodities investment business in Atlanta and came to Atlanta to assist in the establishment of the limited partnerships and revocable grantor trusts that subsequently became, by way of Hayes as trustee, partners in Irwin Eurotrade Partnership. His daily contacts with Hayes in Atlanta, the "anonymous mailing" sent

---

**22.** In *Scott v. Crescent Tool Co.*, 296 F.Supp. 147 (N.D.Ga.1968), Judge Edenfield concluded that subsection (a) "applies to matters in contract, not to those sounding in tort." 296 F.Supp. at 152. This holding was modified by the Fifth Circuit in *Mack Trucks, Inc. v. Arrow* *Aluminum Castings Co.*, 510 F.2d 1029 (5th Cir. 1976), which held that jurisdiction conferred by Georgia's Long Arm Statute embraced all theories of relief "related to" the jurisdiction generating event. *See also Spelsberg v. Sweeney*, 514 F.Supp. 622 at 626, n. 2.

to Georgia residents, and telephone calls to Hayes' Georgia clients, are all evidence of a persistent course of conduct. Furthermore, this court previously found that approximately 30% of the business of Irwin Eurotrade Partnership was derived from the Georgia revocable grantor trusts, thus meeting the statutory requirement of deriving substantial revenue from services rendered in the state. Irwin did not merely promote the establishment of the investment business in Atlanta, which itself would be an insufficient "contact," *see Spelsberg v. Sweeney*, 514 F.Supp. 622 (S.D. Ga.1981); he was actively involved in establishment, maintaining, and pursuing business in Georgia through Hayes, his partner. *See Martin Luther King, Jr. Center for Social Change v. American Heritage Products, Inc.*, 508 F.Supp. 854 (N.D.Ga.1981). This court is convinced that Hayes meets not only the statutory requirements of subsection (c) but the minimum contacts requirement as well. This requirement ultimately reduces to an analysis of fairness and reasonableness. As the Supreme Court stated in *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), "[T]he facts of each case must be weighed to determine whether the requisite affiliating circumstances are present." 436 U.S. at 92, 98 S.Ct. at 1696. In weighing the facts of this case, the court finds that the balance of fairness and reasonableness falls in favor of the plaintiff. To decline to exercise *in personam* jurisdiction over Irwin would in effect be sanctioning his conduct, which had the effect of destroying Hayes' business relationships with his Georgia clients. The evidence presented at trial compels the conclusion that Irwin engaged in a persistent course of conduct in Georgia and derived substantial revenue from his schemes; subjecting him to in personam jurisdiction pursuant to Ga.Code Ann. § 24–113.1(c) does not offend traditional notions of fair play and justice, nor is it unfair or unreasonable to him. Accordingly, jurisdiction as to Count 1 is proper.

### B. Count 2 (Defamation)

■ The tortious acts that form the basis of Count 1 of the plaintiff's complaint also underlie his claim in Count 2. Irwin contends that this court has no personal jurisdiction over him or his company because the defamation exception in subsection (b) of Ga.Code Ann. § 24–113.1 expressly precludes jurisdiction under both subsections (b) and (c). The defamation exception set forth in subsection (b) provides that jurisdiction may be asserted over a non-resident defendant who "commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act." The defendant contends that the exclusionary language of subsection (b) carries over into subsection (c) and that as a result the court has no jurisdiction with respect to Count 2. This court disagrees.

In *Process Control Corp. v. Witherup Fabrications*, 439 F.Supp. 1284 (N.D.Ga. 1977), Judge O'Kelley held that the subsection (b) exemption should not be read to have the far-reaching effect of excluding jurisdiction over nonresidents in all defamation cases despite a nonresident's additional contacts with Georgia. Judge O'Kelley relied upon his former opinion in *Southard v. Forbes, Inc.*, Civil Action No. C74–1984A (N.D.Ga. March 25, 1975) (O'Kelley, J.) *aff'd on other grounds* 588 F.2d 140 (5th Cir. 1979), in which he stated:

> One of the most basic tenets of defendant's argument, and one with which this court strongly disagrees, is the contention that subsection (b) was enacted with the plain meaning and intention that no Georgia resident would even be able to sue any [defendant] for defamation of his character in any court of law in Georgia under any circumstances, no matter how significant that [defendant's] contacts might be with this state so long as that [defendant] is a nonresident within the meaning of Ga.Code Ann. § 24–117. While such an interpretation would not completely bar a defamed plaintiff from seeking redress, it would certainly place an undue hardship on such plaintiff, forcing him to travel to some possibly distant forum, which forum would generally be inconvenient with respect to plaintiff's

evidence, and the forum would be unfamiliar with his reputation and the possible damage done by the libel..... Such an interpretation is patently unreasonable to this court....

Slip Op. at 3–4, quoted in *Process Control Corporation v. Witherup Fabrications*, 439 F.Supp. at 1287.

■ The *Southard* court rejected the reasoning of Judge Edenfield in *A. B. R. Metals and Services, Inc. v. Astralloy-Vulcan Co.*, Civil Action No. C76–298A (N.D.Ga. Aug. 27, 1976) which held that the *Southard* decision led to an anomalous result. In *Process Control*, the court held that a proper reading of *Southard* would interpret subsection (b) to mean that a Georgia court could exercise personal jurisdiction over any nonresident who committed a tortious act or omission within Georgia except for defamation, in which case the non-resident must also have sufficient minimum contacts with the state other than the contacts which arise from the acts constituting the defamation. The Fifth Circuit concurred with this interpretation in *Attwell v. LaSalle National Bank*, 607 F.2d at 1161, where the court held that for tortious conduct to constitute a basis for the exercise of personal jurisdiction under subsection (b), the conduct vesting jurisdiction must be an act or omission separate and apart from the alleged defamatory behavior. The result of these decisions and the view adopted by this court is that the tortious act of defamation *alone* is insufficient to grant jurisdiction over a non-resident. There must be other contacts with the state before jurisdiction may properly be invoked.

The defendant further contends that subsection (c) of the Long Arm Statute subsumes within it the defamation exception contained in subsection (b). This position was formally espoused by Judge Edenfield in *A. B. R. Metals and Services, Inc., supra*; however, in his March 30, 1979, order in this case, he retreats from that position, concluding that jurisdiction over a non-resident defendant pursuant to subsection (c) is not precluded in a defamation action.

The defendant relies on *Cassells v. Bradlee Management Services, Inc.*, 161 Ga.App. 325, 291 S.E.2d 48 (1982), for the proposition that subsection (c) may not serve as a basis for personal jurisdiction. The Georgia Court of Appeals, in rejecting the reasoning of the federal courts in *Process Control*, and *LaSalle National Bank*, held that since subsection (b) expressly excludes an action based on defamation and since "there is essentially no difference between subsections (b) and (c)," subsection (c) may not serve as a basis for jurisdiction for a defamation action.

Although *Clarkson Power Flow* holds that there is "essentially no difference" between subsections (b) and (c), a careful reading of that case reveals that the Georgia Supreme Court was holding that the minimum contacts set forth in subsection (c) are also constitutionally mandated under subsection (b). It is the requirement of additional contacts with the forum state that underlies the similarity between subsections (b) and (c); total exclusion of a cause of action based on defamation is *not* the preeminent factor. The court in *Process Control* followed this reasoning when it required contacts other than the defamatory act itself before a cause of action for defamation could be brought under subsection (b).

■ With these principles in mind, jurisdiction is proper under both subsections (b) and (c). Hayes does not preface Count 1 nor Count 2 on the distribution of defamatory materials (the anonymous mailing and telephone calls) alone; rather, he has shown that Irwin had sufficient other contacts with Georgia to meet the constitutional standards of due process as required by *Clarkson Power Flow*. As discussed in part A, *supra*, those other contacts include Irwin's visit to Georgia in 1976 regarding the structure and operation of new investment schemes, meetings with Cofer, Beauchamp & Hawes to solicit investors for the establishment of certain limited partnerships, contacts with the Kilpatrick, Cody law firm in 1977 for the purpose of initiating a necessary legal action against Hayes, and actions

by members of that firm in furtherance of Irwin's request to bring an action against Hayes for money due him. These actions, in addition to the defamatory acts of the anonymous mailing and the numerous telephone calls provide sufficient "other contacts" so as to properly invoke jurisdiction under subsection (b). Furthermore, these acts indicate that Irwin engaged in a persistent course of conduct so as to premise jurisdiction on subsection (c). Accordingly, jurisdiction over Irwin as to Count 2 of the plaintiff's complaint is proper.

### C. Count 3 (False Arrest)

■■■ This allegation of Hayes' complaint stems from the events surrounding his three-week stay in London, England, in January 1977; specifically, the false charges of theft, his arrest, imprisonment and prosecution. Hayes contends that Irwin's actions in London were part of an intentional scheme to prevent him from receiving his fair share of the profits of the business and to keep him away from his business in Georgia. Jurisdiction is based on Ga.Code Ann. §§ 24–113.1(b) and (c). With respect to subsection (b), the defendant's acts in London constituted an "act outside/injury within" the state of Georgia. Although Hayes' arrest and imprisonment and the immediate effects of embarrassment and humiliation occurred in London, the ultimate effect of these events was to delay Hayes' receipt of his share of the profits of the business and to interfere with his ability to contact clients for his Georgia business. Jurisdiction may also be prefaced on subsection (c) of the statute since Irwin also had the additional minimum contacts with the state of Georgia. This further requirement of minimum contacts, applicable both to subsections (b) and (c), is satisfied by the business that Irwin transacted in Georgia through Irwin Management Company, Irwin Trading Company, and Irwin Eurotrade Partnership in 1976, as well as by the further contacts he had, discussed in parts A and B of this order. This court is persuaded that jurisdiction under subsection (c) is reasonable, *see, e.g., Thorington v. Cash,* 494 F.2d 582, 587 (5th Cir. 1974),

since Irwin, by way of Irwin Eurotrade Partnership, had a London office and could be expected to do business there which would have an effect on the Georgia clients who were, through Hayes, partners in Irwin Eurotrade. Accordingly, jurisdiction over Irwin with respect to Count 3 is proper.

### D. Counts 4 and 5

### (Accounting and One-Half of the Profits)

These two portions of the plaintiff's complaint allege that Hayes is entitled to one-half of the net profits from all business done by and through Irwin and his companies in 1976 and that Hayes is entitled to a complete accounting of the business. Jurisdiction is based on subsection (a) of the Long Arm Statute, which requires that the cause of action arise from the transaction of business within the state. Subsection (a) is to be construed to extend jurisdiction to the limits of due process, *Coe & Payne Co. v. Wood-Mosiac Corp.,* 230 Ga. 58, 195 S.E.2d 399 (1973); *Brooks Shoe Manufacturing, Inc. v. Byrd,* 144 Ga.App. 431, 241 S.E.2d 299 (1977), an interpretation which is consistent with the holding in *J. C. Penney Co. v. Malouf Co.,* 230 Ga. 140, 196 S.E.2d 145 (1973), in which the Georgia Supreme Court equated "transacting any business" in Georgia with the requirement of due process. It is true that an isolated act that might constitute a "contact" leading to a tort may not rise to the level of "transacting business" when jurisdiction is based on contract. *Swafford v. Avakian,* 581 F.2d 1224 (5th Cir. 1978); *Shellenberger v. Tanner,* 138 Ga.App. 399, 227 S.E.2d 266 (1976). However, as the court in *Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.,* 623 F.2d 375 (5th Cir. 1980), held, this result obtains as readily under the due process clause as under the Georgia Long Arm Statute.

■■■ A plaintiff basing jurisdiction on subsection (a) of the Long Arm Statute must establish (1) that the nonresident defendant purposely did some act or consummated some transaction in the state; (2) that the cause of action arose from or was connected with that act, and (3) that the

exercise of jurisdiction by the Georgia courts would not offend traditional notions of fairness and substantial justice. *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 198 S.E.2d 285 (1979). Irwin maintains that since he was not Hayes' partner and since his contacts with the state of Georgia were extremely limited, that any exercise of personal jurisdiction pursuant to subsection (b) would be in violation of traditional notions of fairness and due process. Since this court has found that a partnership existed between Hayes and Irwin, the only remaining issue is whether Irwin had sufficient contacts with the state of Georgia so as not to offend constitutional standards of due process. This court is persuaded that Irwin comes within the parameters of subsection (a) and that jurisdiction is proper with respect to Counts 4 and 5.

The approximately $750,000 [23] in client investments brought in by Hayes, Irwin, and the Irwin entities shows that a substantial portion of that business was transacted in and was connected with the state of Georgia. The revocable grantor trusts were established under the laws of Georgia, the rights of the parties and beneficiaries were subject to the laws of Georgia, and the forum for the administration of each trust was Georgia. As discussed previously, Hayes, a Georgia resident, was appointed trustee of these grantor trusts, which in turn became general partners in Irwin Eurotrade Partnership. These trusts contributed $205,258 to the Irwin Eurotrade Partnership,[24] approximately 30% of the total client investments brought in by Hayes and Irwin in 1976.

Irwin also assisted in the establishment of the Georgia limited partnerships during his visit to Atlanta in 1976. The investors in these limited partnerships, like those in the revocable grantor trusts, were composed of both residents and nonresidents of Georgia. Also like the grantor trusts, the limited partnerships were established under the laws of Georgia. Hayes, a Georgia resident, was the general partner in each of the ten limited partnerships. Funds were deposited into separate bank accounts in Georgia. The ten limited partnerships, which invested $108,750 (approximately 15% of the business in 1976) in options transactions, had their trades executed by Irwin Trading Company.[25]

Numerous transactions were also placed directly with Irwin Trading GmbH by individual Georgia residents who were also partners in the Georgia limited partnerships.[26] These individual transactions with Irwin Trading GmbH invested a total of $48,000, or approximately 5% of the total client business done in 1976.[27] The total dollar amount of business generated in Georgia for the investment business amounted to over $350,000, almost 50% of the total business done in 1976.

Furthermore, Hayes, acting for himself and for Irwin, solicited out-of-state clients from his Atlanta office, received funds from out-of-state investors, transmitted funds from Georgia to out-of-state investors, and received documentation of those trades by Irwin Trading GmbH while residing in Georgia. All of the business generated by the office in Atlanta was a direct result of Irwin's idea to send Hayes back to Georgia to promote their investment business.

Under subsection (a) of the Georgia Long Arm Statute, jurisdiction over a nonresident defendant exists on the basis of transacting business in the state if the nonresident has consummated some transaction in Georgia, if the cause of action arises from or is connected with such act or transaction, if the exercise of jurisdiction by the court does not offend traditional notions of fair-

---

23. The exact figure alleged by Hayes is $748,083. Transcript of testimony, Vol. III, p. 238.

24. Plaintiff's exhibit no. 262, p. B, column 1.

25. Plaintiff's Exhibit 162, p. B, column 5.

26. These Georgia residents are C. B. F. Young, Charles Young, James Young, Gammage, Lindsay, Stewart, Franco, Lee, and Myer, all members of Hayes Associates IV, and four of the five members of Hayes Associates X.

27. Plaintiff's Exhibit 162, p. B, column 9.

ness and substantial justice, and if the opportunity to defend is present. *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 198 S.E.2d 285 (1979); *North Peachtree I–285 Properties, Ltd. v. Hicks*, 136 Ga.App. 426, 221 S.E.2d 607 (1975). Subjecting a nonresident defendant to jurisdiction under subsection (a) requires the plaintiff to meet the three-part test set forth in *Shellenberger v. Tanner*, 138 Ga.App. 399, 227 S.E.2d 266 (1975). He must show some act by which the defendant purposely avails himself of the privilege of conducting activities within the state, thus invoking the benefits and protection of its laws. *Hanson v. Denkla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). However, as the court in *Shellenberger* stated:

> It is not necessary that the defendant or his agent be physically within the forum, for an act or transaction by mail may suffice.
>
> 138 Ga.App. at 404, 227 S.E.2d 266 (footnote omitted).

The court further stated:

> When a nonresident engages in some activity with or in the forum, even a significant single transaction, *whether he be physically present there or not*, and as a result business is transacted or a tortious injury occurs, a jurisdictional "contact" exists between that non-resident and the forum.
>
> 138 Ga. at 408, 227 S.E.2d 266 (emphasis added).

*See also Shingleton v. Armor Velvet Corp.*, 621 F.2d 180 (5th Cir. 1980) (unnecessary for individual corporate officers of seller to actually be present in the state at the time fraudulent misrepresentations were made).

Other cases construing this "transacting any business" provision illustrate how slight the defendant's activity in the state need be, as long as it is purposeful. In *J. C. Penney Co. v. Malouf Co.*, 230 Ga. 140, 196 S.E.2d 145 (1973), the court upheld the exercise of jurisdiction over a nonresident defendant whose only contacts with Georgia were the shipment of its merchandise for delivery to J. C. Penney in Georgia and the existence of a warranty-indemnity contract between the plaintiff and defendant. Simi-

lar contacts in the instant case are the existence of the ten limited partnerships agreements with Georgia residents and Irwin, by way of Irwin Eurotrade Partnership, and the delivery of documentation of trades executed by Irwin Trading to Georgia residents.

In *Brooks Shoe Manufacturing, Inc. v. Byrd*, 144 Ga.App. 431, 241 S.E.2d 299 (1977), the defendant sent its agents to Georgia only three times, to appear at trade shows to assist in the solicitation of potential customers. The claim was based on the alleged breach of the employment contract between the parties and on the defendant's alleged interference with the plaintiff's solicitation of business, a claim also at issue in this case. The court in *Brooks Shoe Manufacturing* upheld the exercise of long arm jurisdiction even though the defendants' activities at the trade shows did not give rise to the cause of action and were related to the plaintiff's claims only to the extent that the defendant engaged in the activities to further the economic benefits derived from the contract sued upon. The court reasoned that under the totality of the circumstances there were sufficient contacts to confer personal jurisdiction over the non-resident defendant under Ga.Code Ann. § 24–113.1(a). 144 Ga.App. at 433, 241 S.E.2d 299.

In *Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375 (5th Cir. 1980), agents of a nonresident licensed seller of ice cream came into Georgia to negotiate with the plaintiff, a pecan supplier, and required the plaintiff to make certain changes in its Georgia plant before entering into a contract. The agents also designated certain parties within the state for receipt of the goods purchased under the contract so that part performance under the contract was to be effectuated in Georgia. The Fifth Circuit held that these contacts, taken as a whole, were sufficient to confer personal jurisdiction over Baskin-Robbins. The holding in this case established the principle that it is not necessary for the plaintiff to show that his claim is based directly on a business transaction which took place in Georgia; it suffices if the claim merely

arises from or is connected with the act or transaction.

A single telephone conversation, crucial to an allegation of fraud, was held to be a contact sufficient to confer jurisdiction over the nonresident defendant in *National Egg Co. v. Bank Leumi le-Israel B. M.*, 504 F.Supp. 305 (N.D.Ga.1980). *But see Wise v. State Board of Examination, Qualification & Registration of Architects*, 247 Ga. 206, 274 S.E.2d 544 (1981) (jurisdiction improper where the sole contact was one telephone call requesting information about an application for council certification). Applying similar reasoning, a single visit by Irwin to Georgia in 1976 to establish the ten limited partnerships for partnership in Irwin Eurotrade and to solicit individual clients from the Cofer, Beauchamp and Hawes law firm would seem to be sufficient to invoke personal jurisdiction. Similarly, in *Thorington v. Cash*, 494 F.2d 582 (5th Cir. 1974), the Fifth Circuit found that letters and telephone calls containing material misrepresentation that were sent into the forum state were sufficient to confer jurisdiction under subsection (a). This court need not speculate over the sufficiency of Irwin's one visit, however, since it was only one of many contacts he had with the state of Georgia.

In *Bigelow-Sanford, Inc. v. Gunny Corp.*, 649 F.2d 1060 (5th Cir. 1981), the court held that jurisdiction under subsection (a) was properly invoked even though the transaction at issue had very few Georgia contacts, since neither the negotiations for the contract nor the execution of the contract occurred in Georgia. The court reasoned that the presence of permanent employees in the state, the receipt of goods under the contract and the shipping of goods to other purchasers constituted sufficient acts for jurisdiction under subsection (a) to be proper.

Finally, *Hollingsworth v. Cunard Line Ltd.*, 152 Ga.App. 509, 263 S.E.2d 190 (1979), provides support for the plaintiff's argument for jurisdiction by holding that if a non-resident purposely seeks to avail itself of business opportunities in Georgia, the resulting business transactions have the requisite connection with Georgia to sustain jurisdiction, regardless of whether the non-resident comes into the state or has agents or independent contractors effect this result. Irwin attempts to distinguish the case by arguing that in *Hollingsworth*, a third party sued the non-resident defendant whereas in this case, it is the agent of the non-resident defendant who brings the suit. This court is unpersuaded by this argument, since the Long Arm Statute makes no distinction between suits brought by resident agents and suits brought by third persons who deal with the agent and non-resident.

The defendant also relies on *Swafford v. Avakian*, 581 F.2d 1224 (5th Cir. 1978); *Pennington v. Toyomenka, Inc.*, 512 F.2d 1291 (5th Cir. 1975); and *O. N. Jonas Co. v. B. & P. Sales Corp.*, 232 Ga. 256, 206 S.E.2d 437 (1974), to support his contention that his one visit in 1976 is insufficient to support and exercise in personam jurisdiction. In *Pennington*, a New York corporation transmitted communications to Georgia by means of telephone and mail. It sent goods into Georgia and was paid by checks drawn on Atlanta banks. The trustee in bankruptcy then brought an action against the corporation alleging that it had received preferential transfers from bankrupts. In concluding that the court did not have personal jurisdiction, the Fifth Circuit examined several factors: (1) the defendant had no agent or employee in Georgia; (2) the defendant never manufactured any products in Georgia; and (3) the defendant had never been authorized to conduct business in Georgia. None of the factors is a concern here: Hayes, as Irwin's partner, was a resident of Georgia and transacted business here; Irwin, by way of Irwin Eurotrade, entered into several limited partnership arrangements with Georgia residents, all executed in Georgia; and Irwin, through Irwin Trading, executed the trades for the Georgia clients. The necessary contacts absent in *Pennington* are therefore present in this case. *Swafford v. Avakian* concerned a domestic situation involving a breach of contract to marry. In dismissing the action for lack of personal jurisdiction, the court held

that several "love letters" and telephone calls from a California resident to the Georgia plaintiff were insufficient for jurisdiction under subsection (a). *Thorington v. Cash*, 494 F.2d 582 (5th Cir. 1974), was distinguished on the basis that it involved a commercial situation and was therefore different from the non-commercial case at issue.[28] The distinction available to the court in *Swafford* is not applicable here, since this case involves a commercial, business situation.

In *O. N. Jonas Co. v. B. & P. Sales Corp., supra,* the Georgia Supreme Court held that subsection (a) did not provide jurisdiction over a nonresident defendant whose only contacts with the state were that its agents had visited the plaintiff's manufacturing plant in Georgia before contract negotiations had been entered into and that goods under the contract were shipped FOB Georgia to points outside the state. The court of appeals in *Delta Equities, Inc. v. Larwin Mortgage Investors,* 133 Ga.App. 382, 211 S.E.2d 9 (1974), held that jurisdiction under subsection (a) was proper where the nonresident defendant had met with the plaintiff in California and in Florida, made two visits to Georgia to negotiate the contract, and resolved the differences and closed the contract by telephone from California. The cases are not incompatible, however, since the *O. N. Jonas* court made clear that in that case "there were no negotiations or contracts entered into in Georgia with respect to the goods that are the subject matter of these actions." 232 Ga. at 258, 206 S.E.2d 437. The instant case is more akin to *Delta Equities,* since Irwin came to Georgia to establish a business that was to be a partner in one of his companies, since he kept in contact with one law firm in Atlanta with regard to his plans for a law suit against Hayes, since he encouraged his partner Hayes to establish himself in Georgia to promote their business, and since he was in almost daily telephone contact with Hayes regarding the running of their investment business. These contacts, among others, are far more extensive than was the case in *Jonas.*

These contacts of Irwin also defeat his argument that his activities in Georgia were "unilateral." *See Shellenberger v. Tanner,* 138 Ga. at 408, 227 S.E.2d 266. The evidence clearly revealed that Hayes and Irwin worked closely in planning their business arrangement whereby Hayes would generate business for Irwin and his entities; that the parties agreed to divide the profits of the business in Georgia equally, that the parties regarded themselves as partners, that Irwin came to Georgia to assist in establishing the business, and that Irwin supplied pamphlets, forms, and other documents for the establishment of the ten limited partnerships.

These contacts, standing alone, may or may not be sufficient to sustain jurisdiction under subsection (a), but taken together they reveal that Irwin purposely availed himself of the privilege of doing business in Georgia. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Under the totality of the circumstances, there are more than sufficient contacts to confer personal jurisdiction over Irwin under subsection (a). Subjecting him to the jurisdiction of this court does not offend notions of fairness and due process; he reasonably could have anticipated being required to answer for his actions in Georgia.

E. Count 6 (Breach of Fiduciary Duty and Breach of Contract as Partner of Irwin Eurotrade Partnership)

Count 6 of Hayes' complaint alleges that Irwin breached his contractual and fiduci-

**28.** In *Kulko v. Superior Court of California,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), the Supreme Court distinguished between commercial and noncommercial activities for purposes of determining the scope of the Long Arm Statute, and decided that the domestic situation present in *Kulko* would render personal jurisdiction unreasonable over the nonresident defendant. The court reasoned:

[T]he mere act of sending a child to California to live with her mother is not a commercial act and connotes no intent to obtain nor expectancy of receiving a corresponding benefit in the state that would make fair the assertion of that state's judicial jurisdiction. 436 U.S. at 101, 98 S.Ct. at 1701.

ary duties as the managing partner of Irwin Eurotrade Partnership, the entity established to execute "cash and carry" transactions for commodities investments in Europe. Count 6 is to be distinguished from Counts 4 and 5 in that the claims for an accounting and one-half of the profits relate to the individual partnership between Hayes and Irwin that conducted transactions on behalf of other persons; Count 6 relates to the partnership between Irwin and Hayes as trustee for the revocable grantor trusts set up for clients in Georgia and elsewhere and to the partnership between Hayes in his individual capacity and Irwin Eurotrade Partnership.

Hayes joined the Irwin Eurotrade Partnership in 1976, which was accomplished by a transfer of his interest in a personal account in Irwin Trading Company. Each of the revocable grantor trusts, with Hayes as trustee, became a general partner of the Irwin Eurotrade Partnership. The partnership agreements between the various trusts and the Irwin Eurotrade Partnership were signed, on behalf of the trust, by Hayes as trustee.

Hayes alleges that Irwin has breached his fiduciary duties as managing partner of the Irwin Eurotrade Partnership (1) by failing to account to the partners as to the partners' interests in the trusts; (2) by purporting to resign as managing partner of the partnership without notifying any of the partners, in violation of his obligations under the partnership agreement; (3) by transferring assets out of the partnership without authorization and without notice to the other partners; and (4) by transferring his interest and the interest of his clients from the partnership to an outside entity without the knowledge or consent of the other partners.

■ These breaches of fiduciary duty are breaches as to the partners of the Irwin Eurotrade Partnership. The breaches injured Hayes who was himself, individually, a partner and each of the Georgia grantor trusts, of which Hayes was trustee and as to which the plaintiff's clients were grantors and beneficiaries. Jurisdiction may be properly based on subsections (a), (b), and (c) of the Georgia Long Arm Statute. To the extent that these breaches of fiduciary duty may be characterized as tortious, this court has jurisdiction over Irwin under subsections (b) and (c), since these breaches have caused damage within the state of Georgia. Furthermore, this court has established that Irwin had sufficient other contacts with the state to meet the constitutional standards of due process.

■ Furthermore, Irwin has, through Irwin Eurotrade Partnership, purposely availed himself of the privilege of doing business in the state of Georgia and has derived substantial funds and substantial income from its dealings with Hayes and the Georgia grantor trusts, thereby "transacting business" under subsection (a) of the Long Arm Statute.

Furthermore, personal jurisdiction pursuant to subsection (a) is proper in that the activities of Irwin and Irwin Eurotrade Partnership were part of an overall scheme to conduct business in Georgia. As discussed previously, Irwin formulated the idea of setting up an office in Atlanta with Hayes to act as manager. Furthermore, he assisted in the establishment of the Georgia revocable grantor trusts, which subsequently became general partners in Irwin Eurotrade Partnership. It is obvious that Irwin availed himself of the privilege of doing business in Georgia. His contacts with this state were not merely isolated occurrences but were activities of a continuing and systematic nature. Under the standards enunciated in *Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375 (5th Cir. 1980), and the cases discussed in part (D), *supra*, this court has jurisdiction pursuant to Ga. Code Ann. § 24–113.1(a) as well as subsections (b) and (c).

### F. Count 7 (Fraud)

■ In this count of the complaint, Hayes contends that Irwin attempted to defraud him out of his share of the profits realized by the partnership in 1976 and that Irwin's actions amount to tortious conduct causing injury in Georgia, thus invoking

subsections (b) and (c) of the Long Arm Statute. As evidence of his allegation of fraud, Hayes refers to the fact that Irwin on several occasions gave false accountings and during the events in London, attempted to further delay an accounting of the profits of the firm. Furthermore, Hayes contends that Irwin engaged the Kilpatrick, Cody law firm to threaten him with litigation on a false claim that Hayes owed Irwin substantial amounts of money. Hayes contends that Irwin's actions were evidence of his intent to not pay Hayes his allotted share of the business. Other than the $50,-000 Hayes received from Irwin following the events in London, he has never been paid his share of the business. These allegations constitute an "act without/injury within" sufficient to invoke jurisdiction under subsection (b) of the Georgia Long Arm Statute. Furthermore, this court is persuaded that Irwin engaged in a persistent course of conduct in his attempt at avoiding payment of Hayes' share of the profits sufficient to confer jurisdiction under subsection (c) as well.

G. Count 8 (Breach of Contractual and Fiduciary Duties on the part of Irwin and Irwin Trading GmbH with Respect to Documentation of Trades)

■ This count of the plaintiff's complaint alleges that Irwin and Irwin Trading GmbH breached their duties as agents of Hayes and of Hayes' clients with respect to executing transactions on behalf of Hayes and his clients. Irwin admits that in undertaking to execute these transactions he was acting as an agent for Hayes pursuant to a contractual obligation to execute the transactions. Irwin maintains that this allegation is totally inconsistent with any argument that a partnership existed; however, Irwin appears to ignore a general principle of law that each partner in a partnership is an agent of the other. See *Flynn v. Reaves*, 135 Ga.App. 651, 218 S.E.2d 661 (1975); *Burdell v. Georgia Railroad Bank & Trust*, 124 Ga.App. 828, 186 S.E.2d 291 (1972) (a partner in an association is an agent of that association, and the association is liable under the theory of respondeat superior for a partner's torts committed within the scope of the association's business.)

Pursuant to the duties to execute the transactions for trades on behalf of Hayes and Hayes' clients, Irwin and Irwin Trading GmbH were obligated to provide Hayes and his clients with confirmations evidencing the execution of the transactions. Hayes contends that Irwin failed and refused to provide this documentation which Hayes continually requested. Since the documentation was to be provided for the Georgia clients who were investing and trading through Hayes, Hayes maintains that Irwin is subject to the jurisdiction of this court pursuant to sections (b) and (c) of the Long Arm Statute.

■ Hayes contends, and this court agrees, that *Hollingsworth v. Cunard Line Ltd.*, 152 Ga.App. 509, 263 S.E.2d 190 (1979), is controlling with regard to the jurisdiction issue. Applying the reasoning of that decision, this court is persuaded that Hayes, a Georgia resident, may sue Irwin, a California resident, since Irwin undertook to execute these transactions on behalf of the Georgia residents. Due process does not require the Georgia customer to travel to California to pursue any action. Irwin specifically authorized and directed Hayes to conduct business in Georgia on behalf of him and his companies; Irwin purposely availed himself of the privilege of doing business with Georgia and its residents and derived substantial revenue from that business in the state of Georgia. Accordingly, jurisdiction under subsection (a) of the Long Arm Statute is proper.

## III. LIABILITY

As with the determination of the applicable principles of jurisdiction, this court will examine each count of the plaintiff's complaint to determine the issues of liability.

A. Count 1 (Tortious Interference with Business Relations)

Hayes contends that the anonymous mailing, the various telephone calls made by Irwin and Anderson to his clients, and the

disruption of his ability to solicit prospective clients while in London are all evidence of Irwin's malicious intent to interfere with his business relationships. As a result of Irwin's actions, Hayes alleges that his credibility as a broker/dealer was virtually destroyed and that he lost numerous clients, both current and prospective. Irwin maintains that his actions were privileged since they were simply honest methods of competition between two businessmen.

■ In establishing a cause of action for malicious interference with business relations, a plaintiff must demonstrate that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury. *Record Data, Inc. v. Preferred Research of Georgia, Inc.*, Civil Action No. C78–1339 (N.D.Ga. Feb. 14, 1979) (Freeman, J.), *aff'd*, 633 F.2d 581 (5th Cir. 1980).[29]

■ Interference with business relations, like interference with contractual relations, is an intentional tort. Since intentional interference is a prerequisite, it presupposes knowledge of the plaintiff's interest or facts that would lead a reasonable man to believe in their existence. *See Allstate Beer, Inc. v. Julius Wile Sons & Co.*, 479 F.Supp. 605 (N.D.Ga.1979); *accord, Morse v. Piedmont Hotel Co.*, 110 Ga.App. 509, 139 S.E.2d 133 (1964); *Piedmont Cotton Mills, Inc. v. H. W. Ivey Construction Co.*, 109 Ga.App. 876, 137 S.E.2d 528 (1964). A cause of action for tortious interference also encompasses interference with a pro-

spective business relationship as well as existing ones, *Wilcon, Inc. v. Travelers Indemnity Co.*, 654 F.2d 976 (5th Cir. 1981); *Merlite Land, Sea and Sky, Inc. v. Palm Beach Properties, Inc.*, 426 F.2d 495 (5th Cir. 1970); the liability results not only from disruption of the relationship but also from elimination of the injured party's ability to perform. In order to establish a cause of action for interference with prospective business relations, the plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact. *Wilcon, Inc. v. Travelers Indemnity Co., supra.*

■ Since this cause of action requires a showing of intent, Hayes must demonstrate that Irwin's conduct was malicious rather than negligent. The term "malice" lacks precision, since it can mean anything from the primary intention to harm another to mere intention to do an act by one who, from knowledge of the interests of another, knows that it will interfere with them. The Georgia Supreme Court has held that the term "malicious" or "maliciously" means any unauthorized interference or any interference without justification or excuse. *Luke v. DuPree*, 158 Ga. 590, 596, 124 S.E. 13 (1924). In the context of tortious interference with business, the term is to be construed liberally: The act is malicious when it is done with knowledge of the plaintiff's rights and with the intent to interfere with them. *Architectural Manufacturing Co. v. Airotec, Inc.*, 119 Ga.App. 245, 166 S.E.2d 744 (1969). *See also Slautterback v. Intech Management Service, Inc.*, 247 Ga. 762, 279 S.E.2d 701 (1981). Personal ill will or animosity is not essential to a

---

29. This test, enunciated by Judge Richard C. Freeman, is a restatement of the test set forth in the Restatement (second) of Torts, § 768, which requires the following standards for a claim of privilege for soliciting employees: (1) the relation concerns a matter involved in the competition between the actor and the competitor; (2) the actor does not employ improper means; (3) the actor does not intend thereby to create or continue an illegal restraint of competition; and (4) the actor's purpose at least in part is to advance its interests in its competition with the other.

Prior to the specific elements of proof set forth in *Record Data*, the appropriate legal standard for a cause of action for malicious interference was set out in *NAACP v. Overstreet*, 221 Ga. 16, 142 S.E.2d 816 (1965):

Where one maliciously and wrongfully, and with the intent to injure another person's business prevents others from dealing with him and his business is thereby injured, the person thus injured has a cause of action against the person thus causing the injury, for the loss and damage sustained.

221 Ga. at 21, 142 S.E.2d 816.

finding of malice. *Luke v. DuPree, supra.* Malice plus injury to business of itself does not, however, constitute the tort of wrongful interference with business. Rather, an independent wrongful act is required as well as an injury. *Keystone Metal Moulding Co., Inc. v. R & W Metals Co.,* 486 F.Supp. 813 (N.D.Ga.1980).

The line between tortious interference and mere competitive effort is frequently difficult to ascertain. To come under the protection of the competition privilege, however, a defendant must demonstrate (1) that the relation concerns a matter involved in the competition between the actor and the competitor, (2) that the actor does not employ improper means, (3) that the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) that the actor's purpose at least in part is to advance its interest in its competition with the other. *Orkin Exterminating Co. v. Martin Co.,* 240 Ga. 662 at 666, 242 S.E.2d 135 (1978).

In light of the findings of fact made by this court regarding the anonymous mailing from Washington, D. C. and the telephone calls to numerous clients of Hayes, this court concludes that Irwin intentionally interfered with Hayes' business relationships with his clients, causing Hayes to lose his credibility and to suffer the loss of a number of his accounts. The facts in the instant case are distinguishable from the situation in *Record Data v. Preferred Research of Georgia, Inc., supra,* where Judge Freeman held that the anonymous mailings of court complaints and a copy of the judgment did not amount to tortious interference with business relations. In that case, the plaintiff failed to show it had incurred any damage from the defendant's conduct, a situation which is not the case here. The activities of Irwin go far beyond the activities found to be privileged in *Record Data.* Irwin did not merely send a copy of lawsuits filed against Hayes; his purported summary of litigation involving Hayes was replete with editorial remarks maligning Hayes. Irwin also went further than the defendants in *Record Data* by his use of telephone calls to a number of the plaintiff's clients. The thrust of all of these telephone calls was to plant doubt in the clients' minds with respect to Hayes' ability to carry out the transactions that he said he could do and to imply to the clients that Hayes was dishonest.

Hayes presented testimony to support his claim that Irwin also interfered with his prospective business relationships. One of Irwin's telephone calls was to Robert Minnear, the partner in charge of the Atlanta office of Touche Ross & Company, the accounting firm representing some of the Georgia clients doing business with Hayes. Irwin told Minnear that Hayes was "unscrupulous" and that Touche Ross ought to investigate the court actions pending against Hayes in California. The other conversation was with Simeon Spear, an accountant in Miami, Florida. Hayes had been introduced to Spear by Joe Jackson, and after talking with Hayes about various investment opportunities, Spear asked Hayes to send him ten subscription agreements for his clients in Florida. After this conversation, Spear telephoned the Touche Ross office in Atlanta to inquire about Hayes and was told that Irwin had contacted them about certain problems with Hayes. Spear then called Irwin and after their conversation returned the subscription agreements to Hayes, indicating that his clients would not go forward with any investments. These are but two of the many occasions where Irwin attempted to disparage Hayes' ability and expertise in the investment business.

An assertion of a competition privilege is not plausible when viewed in the light of a partnership. Such activities serve no valid purpose for two businessmen who ostensibly are working together on behalf of clients all over the country. Harry Hickson, a tax attorney in Atlanta who did business with Hayes, was also a recipient of one of the telephone calls from Irwin. In his testimony, Hickson testified that although he could not remember the exact content of the conversation with Irwin, he remembers statements made regarding lawsuits filed

against Hayes in California. Hickson testified that although the conversations with Irwin did not exactly preclude him from making further investments with Hayes, it did "have an effect" [30] in that the conversation was extremely disturbing and upsetting since Hayes' honesty was put in doubt. Hickson further testified that the conversation with Irwin was highly emotional and interspersed with profanity and that he came away from the telephone conversation with the feeling that he did not want to do business with Hayes for various and sundry reasons.

The deposition of Christine Johnson, Irwin's former secretary, was introduced at trial. Ms. Johnson testified that when Irwin mentioned the name of John Hayes, he became very violent, stating that he hated Hayes because Hayes had tried to take his whole business away from him.[31] With respect to the anonymous mailing from Washington, D. C., Ms. Johnson testified that on the day that the documents were prepared for the mailing, Irwin stated "I think this is really going to do it." [32] She further testified that she heard talk in the office that day between Irwin and Hayes' other secretary, Joy Hille, stating that this was the one last chance Irwin had to ruin Hayes.[33]

The effect of all of these actions on Hayes' business was to virtually destroy his relationships with a number of his clients: Dr. John Everett Lee testified that the letter and the telephone call from Anderson influenced his decision not to deal with Hayes; Lamar Gammage testified he was apprehensive after receiving the mailing and decided not to do any further transactions with Hayes; Frank Young, C. B. F. Young, James Young, Charles Young, Don Shula, Jim Morgan, and James Hudson, all of whom were clients of Hayes in 1976, refused to do business with Hayes after receiving the anonymous mailing in 1977.

Irwin's actions were not merely those of an honest competitor trying to solicit clients away from Hayes for his own purposes. He intentionally and maliciously sought to destroy Hayes' credibility and reputation as a broker/dealer and succeeded in doing so in numerous respects. Although Judge Freeman found that the defendants in *Record Data* were privileged in their actions under a theory of competition, the deplorable actions of Irwin in this case do not meet the standards set forth in *Orkin Exterminating Co. v. Martin Co.*, 240 Ga. 662, 242 S.E.2d 135 (1978), which established the competition privilege. The line between healthy competition and pusillanimous business tactics was not only crossed over in this case but obliterated.

### Count 2 (Defamation)

The definitions of libel (written defamation) and slander (oral defamation) [34] in Georgia are set forth in Ga.Code Ann. §§ 105–701, –702. Ga.Code Ann. § 105–701 provides:

A libel is a false and malicious defamation of another, expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred, contempt, or ridicule. The publication of the libelous matter is essential to recovery.

Ga.Code Ann. § 105–702 provides:

Slander, or oral defamation, consists, first, in imputing to another a crime punishable by law; or, second, charging him with having some contagious disorder, or being guilty of some debasing act which may exclude him from society; or, third, in charges made against another in reference to his trade, office, or profession, calculated to injure him therein; or, fourth, any disparaging words productive of special damages flowing naturally therefrom.

---

**30.** Transcript of testimony, Vol. VII, p. 109.

**31.** Transcript of testimony, Vol. VII, pp. 139–141.

**32.** Transcript of testimony, Vol. III, p. 145.

**33.** Transcript of testimony, Vol. III, p. 182.

**34.** The definition of slander in Georgia has been incorporated into the definition of libel. *Hardy v. Williamson*, 86 Ga. 551, 12 S.E. 874 (1891); *Southland Publishing Co. v. Sewell*, 111 Ga. App. 803, 143 S.E.2d 428 (1965).

In the last case, special damage is essential to support the action; in the first three, damage is inferred.

Libel *per se* is a publication charging that one is guilty of a crime, dishonesty, or immorality. To be actionable, the statement must be both false and malicious. *Mathews v. Atlanta Newspapers, Inc.*, 116 Ga.App. 337, 157 S.E.2d 300 (1967). No proof of special damages is required if the libel is of the *per se* variety. Furthermore, punitive damages may be awarded in a case where the supporting facts exist independent of the presumption of malice arising by the mere fact of defamation. *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.), *aff'd*, 580 F.2d 859 (5th Cir. 1976).

A defamation may also occur in indirect terms or by "innuendo." *Garland v. State*, 211 Ga. 44, 84 S.E.2d 9 (1954). If the publication is not libelous *per se* and has no necessarily defamatory meaning but can be understood in more than one way, one of which is defamatory, ambiguous words may be clarified in meaning by reference to the circumstances surrounding the publication and may thereby constitute libel by innuendo. *Southard v. Forbes*, 588 F.2d 140 (5th Cir. 1979); *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25 (5th Cir. 1973). In establishing libel by innuendo, the publication must be construed as a whole in its plain, natural, and ordinary meaning, as other people would understand it, according to the sense in which it appears to have been published and the idea it was meant to convey. *Southard v. Forbes*, 588 F.2d at 143, citing *Garland v. State*, 211 Ga. at 46, 84 S.E.2d 9. The language of an alleged libel must be construed, not by what the writer intended to mean, but by the construction which would be placed upon it by the average and reasonable reader. *Southland Publishing Co. v. Sewell*, 111 Ga.App. 803, 143 S.E.2d 428 (1965). The loss of employment, income, or profits is categorized as special damage and is sufficient injury upon which to predicate an action for libel where the defamatory words are not libelous *per se. Hood v. Dun & Bradstreet, Inc., supra.*

An action for libel may also be brought where a published statement has been made in regard to another in his trade, office, or profession, calculated to injure him. *Hood v. Dun & Bradstreet, Inc., supra.* Clause 3 of the definition of slander also refers to charges made against another in his trade, office, or profession, and although part of the definition of slander, it also gives rise to a libel action. *Southard v. Forbes, supra.*

Publication of any libelous matter imposes on the publisher the burden of rebutting the accompanying presumption of malice. *Montgomery v. Pacific & Southern Co.*, 131 Ga.App. 712, 206 S.E.2d 631 (1974). Ga.Code Ann. § 105–706 provides that in all actions for printed or spoken defamation, malice is to be inferred from the character of the charge. With respect to proof of malice, proof that the writing is false and that it maligns the private character or mercantile standing of another is itself evidence of legal malice. *Montgomery v. Pacific & Southern Co., supra.* Malice is also inferred by law from the character of the defamation where there is an absence of lawful excuse or the absence of a privilege. Ga.Code Ann. §§ 105–2002, –2003; *The Atlanta Journal Co. v. Doyal*, 82 Ga.App. 321, 60 S.E.2d 802 (1950). Actual malice may further be shown by "reckless disregard" of whether the statement published was false as well as by actual knowledge. *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). The constitutional standard of proof of actual malice is that of "convincing clarity." *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Ga.Code Ann. § 105–709 does provide that some communications and publications are privileged from charges of defamation. In the field of defamation, truth and absolute privilege are the only complete defenses to publication of communications which would otherwise be slanderous or libelous. Privileged communications are divided into two classes: absolute and conditional (qualified). *McCracken v. Gainesville*

*Tribune, Inc.*, 146 Ga.App. 274, 246 S.E.2d 360 (1978). The characteristic feature of an absolute privilege, as distinguished from a conditional privilege, is that in the former, the question of malice is not open; all inquiry into good faith is closed. *Atlanta News Publishing Co. v. Medlock*, 123 Ga. 714, 51 S.E. 756 (1905). In order to claim a conditional privilege under Ga.Code Ann. § 105–709(4), the communication must be made only to proper persons and the privilege may not be used as a cloak for venting private malice. *Melton v. Bow*, 241 Ga. 629, 247 S.E.2d 100 (1978). A conditional privilege is lost if maliciously made, even though the source of the communication is quoted. *McCracken v. Gainesville Tribune, Inc., supra.* Furthermore, exaggerated expressions must be avoided, for the privilege may also be lost by the use of intemperate and violent language. *Sheftall v. Central of Georgia Ry.*, 123 Ga. 589, 51 S.E. 646 (1905).

▉▉▉ One may publish, by speech or writing, whatever he honestly believes is essential to the protection of his own rights, provided the publication is not unnecessarily provided to those other than who the publisher honestly believes are concerned with the subject matter of the publication. To make the defense of privilege complete, good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons must all appear. The absence of any element will, as a general rule, prevent the party from relying on the privilege. *Sheftall v. Central of Georgia Ry., supra.*

▉▉▉ The word "fair" in the phrase "fair and honest reports," set forth in Ga. Code Ann. § 105–709(4), is characterized by integrity, fairness, and straightforwardness in conduct. Since the words "fair and honest" modify the word "reports" it is clear that the report must be both impartial and accurate. What is demanded of a publisher is "neutral reportage." *McCracken v. Gainesville Tribune, Inc.*, 146 Ga.App. at 276, 246 S.E.2d 360. The word "trade" in Ga.Code Ann. § 105–702, includes employment by another; a charge that a statement is slanderous or libelous must be of

something that would affect a plaintiff's character generally in his trade. *Rogers v. Adams*, 98 Ga.App. 155, 105 S.E.2d 364 (1958).

Hayes bases his cause of action for defamation on several activities by Irwin: (1) the anonymous mailing in October 1977 to Hayes' clients, (2) the telephone calls made by Irwin to Hayes' clients as well as Robert Minnear, in which Irwin told the parties that Hayes was an unscrupulous person and disparaged his integrity, honesty, and ability to carry out business dealings, (3) the telephone calls of Anderson, at the request of Irwin, to various of Hayes' clients intimating that Hayes was dishonest and that Hayes was not capable of transacting the business that the clients thought he was, (4) the letter written by Irwin on October 30, 1980, to all of the clients involved in the various Hayes Georgia limited partnerships stating that the trading records were forged, that Hayes had not paid brokerage charges to Irwin Trading GmbH, that Hayes had lied about having a partnership arrangement with Irwin, that Hayes had wrongfully frozen funds of the clients in order to receive a $50,000 payment, and that Hayes intended to water down the investments of the clients, (5) the false arrest warrant issued by Irwin in January 1977 in London, England, which caused Hayes to be arrested and detained in England for almost three weeks, and (6) the California lawsuit filed in December 1980 against Hayes and the various limited partners in the Hayes Georgia limited partnerships which was facially defective for lack of jurisdiction. Irwin seeks to invoke the conditional privilege of fair and honest reporting set forth in Ga.Code Ann. § 105–709(4).

▉▉▉ This court is persuaded that this conditional privilege has no applicability given the facts of this case. The evidence demonstrates that Irwin acted in bad faith in that he was motivated by actual malice. The testimony of Christine Johnson, Irwin's former secretary, reveals that Irwin's intent was far from "fair and honest." After receiving a letter summary from Wiles &

Circuit concerning the status of various cases filed against Hayes in California, Irwin prepared his own summary complete with editorial remarks regarding Hayes' honesty and business practices. Irwin had this summary duplicated at Broward Duplicating Service, had Joy Hille place it in envelopes to Hayes' clients, and instructed her to mail the box containing the envelopes to her mother-in-law, who worked at the post office in Washington, D. C., for remailing with a Washington, D. C. postmark. The fact that Frances Southworth, Joy Hille's mother-in-law, and Joy Hille did not actually know what the documents were and could not identify them at a later time is not significant. Ms. Johnson's testimony regarding Irwin's statements that "I think this is really going to do it," discussed above, indicates that Irwin's motives behind the publication were not to promote competition between himself and Hayes but were intended to defame Hayes.

As the court in *Melton v. Bow*, 241 Ga. 629, 247 S.E.2d 100 (1978), stated a publication "may not be used as a cloak for venting private malice." This is precisely what Irwin did. There was a complete absence of good faith; the interest that was to be upheld was not to promote competition but rather to disparage Hayes' integrity and business acumen. The facts in *Melton* are very similar to the situation at bar in that the defendant called the plaintiff a liar and made many other derogatory remarks about him. The reactions of various parties were very similar in that case to the situation here, in that one of the recipients of the publication in *Melton* stated that the publication "made me wonder about" the plaintiff. 241 Ga. at 630, 247 S.E.2d 100. Similarly, the reactions of Hayes' clients after receiving the Washington mailing and the telephone calls were to doubt Hayes' business ability and in some instances resulted in a decision not to do business with him in the future.

■ The court also finds that Irwin defamed Hayes in London when he imputed the crime of theft to him and even caused him to be falsely arrested, as discussed in

part C, *infra.* Such defamation is actionable *per se* without proof of special damages. *Melton v. Bow*, 241 Ga. 629, 247 S.E.2d 100 (1978).

This court concludes that Irwin made both libelous and slanderous remarks against Hayes by way of the anonymous mailing and the various telephone calls to Hayes' clients. His conduct was in no way privileged, and he must be held responsible for his conduct and held liable to Hayes under this count of the complaint.

### C. Count 3 (False Arrest and Imprisonment)

■ A cause of action for false arrest is set forth in Ga.Code Ann. § 105–1001, which provides: "An arrest under process of law, without probable cause, when made maliciously, shall give a right of action to the party arrested." Malice, for purposes of this statute, is defined in Ga.Code Ann. § 105–1002 as consisting of "personal spite [or] a general disregard of the right consideration of mankind, directed by chance against the individual injured." Want of probable cause exists when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding except for his desire to injure the accused. Ga.Code Ann. § 105–1003. The tort of malicious prosecution is set forth in Ga. Code Ann. § 105–801, which provides: "A criminal prosecution, maliciously carried on, and without any probable cause, whereby damage ensues to the person prosecuted, shall give him a cause of action."

■ The remedy of the accused depends on whether he is actually prosecuted under the warrant. Following the arrest, if the warrant is dismissed or not followed up, a plaintiff's remedy is one for malicious arrest. If the action is carried on to prosecution, however, an action for malicious prosecution is the exclusive remedy. *See Smith v. Embry*, 103 Ga.App. 375, 119 S.E.2d 45 (1961).

■ The activities upon which this count of the complaint is based are the arrest and imprisonment of Hayes in London in January 1977. The warrant sworn

out by Irwin reveals that Irwin charged Hayes with stealing four pieces of paper, a partnership agreement and other documents belonging to him. Irwin makes no effort to deny that he swore out this warrant or that he accused Hayes of the theft of the documents. He also states that the humiliation, the embarrassment and the shock to Hayes in having been arrested in London, having been subjected to interrogation and having spent a night in jail cannot be denied.

This court is of the belief that Hayes is entitled to recover on a claim of false arrest arising out of his arrest in London. Since the charges against him were eventually dropped and the court costs taxed against Irwin, this court is not of the belief that he has a cause of action for malicious prosecution. Accordingly, this court concludes that Irwin is liable to Hayes for false arrest under this count of the complaint.

D. Counts 4 and 5 (Accounting and Suit for One Half of the Profits)

Pursuant to the November 1976 agreement, Hayes was to receive one-half of the profits from the business transacted that year after the expenses of both men were deducted. Hayes contends that Irwin has never given him a complete and true accounting for the business done in 1976 or his allotted share of the profits. Hayes requests the court to issue an injunction ordering Irwin to prepare a complete accounting of the business accomplished in 1976 and to adjudge Irwin liable in the amount of $347,913.50, together with interest, as representing Hayes' one-half share of the estimated profits of 1976, which he alleges amounted to $748,083.00.

This agreement to split the profits of the business in 1976 arose from a meeting between Hayes and Irwin in November 1976, when Hayes flew to California to meet with Irwin about the hiring of a proposed employee. The existing financial arrangement prior to this meeting was that Hayes was to receive $6,000 for every $16,000 brought into the business. Hayes contends that at the November meeting, this arrangement was superseded by Irwin's offer to split the

profits of the business evenly. Hayes testified about the exact terms of this agreement several times, both on direct and cross-examination, and a close examination of that testimony is necessary to determine if $748,083.00 is the proper figure representing the *profits* of the business in 1976.

On direct examination, the following colloquy occurred:

Q Now, Mr. Hayes, did that number, 732 whatever it more exactly is, represent the income to the enterprise for the year 1976?

A May or may not have.

It represented the total amounts of monies that we took in from all the clients, if we used up all the money in trading, yes, it could have or it could have represented a portion of the income, because that money might have generated other trades of which we charge—we being Mr. Irwin and myself, GmbH etc.—a commission to do or spread to do, etc. So it could have been even in excess of that.

(Transcript of testimony, Vol. I, pp. 196–97.)

On cross-examination, the following testimony occurred:

Q What is correct insofar as that method of division of 50 percent that you're speaking about down here?

A Okay. That is the base on which I started, the cost of the agreement that Mr. Irwin and I had was that we would take all our income that we took in from the different businesses for the year.

We would subtract out our expenses. Whatever was left, we would split fifty-fifty.

I have no idea what the income was. That's part of what my whole suit is about.

The only thing I can start from is the base of the amount of money that we took in.

Q All right. Is it your statement that of the actual monies taken in, after taking out your expenses and Mr. Ir-

win's, that you were to divide that money as between the two of you?

A You have misstated my statement three times, and I will state it again. This is the basis on which I have tried to begin making some kind of calculations, because the original premise was, between Mr. Irwin and I, whatever business we did, whatever monies we had come in, came into the different entities that we trade with, whatever profits we make off all those transactions, less his expenses less my expenses, we subtract, and we split that difference.

I have no idea if that $748,000 generated another 2 million dollars in profits to the GmbH or whomever or whatever Mr. Irwin may have traded through. Money in a commodities account is worked on a leverage basis, and money in a commodities account can generate an awful lot of commissions and an awful lot of expenses.

I have no idea of knowing that. Therefore, my premise is I have to start with this amount of money right here.

I have asked for three years now from all of his counsel and from him to show me what trades were done by that money put in there, and then I could certainly know exactly what the costs were, exactly what the profits were, and if he had done that, I wouldn't be sitting here in a courtroom three years later.

Q Would those be profits of you and Mr. Irwin if you had made profits insofar as the trades that you had authorized?

A Mr. Hatcher, the profits would be the monies that was made off the trades that were generated.

(Transcript of testimony, Vol. II, pp. 67–69.)

Hayes contends that the $743,083.00 figure represents the profits generated by the business in 1976 and that his share should be calculated by that figure by using the following formula: (1) Determine the gross income from the business done by Hayes and Irwin in 1976, which Hayes contends is $748,083; (2) subtract from the gross income the expenses incurred by Hayes and Irwin; (3) divide the remainder by 2 to determine each individual share of the net profits; (4) add to Hayes' share the amount of his expenses to determine the gross amount to which he is entitled; and (5) subtract from this figure the net amount that had previously been paid to Hayes. With respect to this last portion of the formula, Hayes contends that he has had a net amount of $52,000 paid to him by Irwin.

The testimony at trial was extremely confusing with respect to the monies paid to and paid by Hayes in connection with his dealings with Irwin and Irwin's companies. It appears that Hayes paid $80,000 as advance of capital for the operation of the enterprise in 1976. He apparently paid $12,000 back to one of the Irwin companies as a repayment of a commission originally received for one particular transaction known as the Willey transaction. He received a total of $144,000 from Irwin and Irwin's companies, comprised of several different payments consisting of wire transfers and checks,[35] and paid out a total of $92,000, with the resulting net income to him of $52,000.

This court agrees that the proposed formula is the proper one to apply in determining Hayes' allotted share of the profits and agrees that Hayes received a net amount of $52,000 from Irwin and Irwin's companies. Irwin strongly argues, how-

---

35. The $144,000 that Hayes received from Irwin and his companies is comprised of the following payments:

1. $30,000 wired on 8/26/76
2. $24,000 wired on 9/13/76 (representing two payments of $12,000 each as commissions);
3. $5,000 wired on 11/4/76
4. $5,000 check dated 12/1/76
5. $30,000 wired on 12/31/76
6. $50,000 wired on 3/2/77

Of this amount, $59,000 came from Irwin Trading Company (numbers 1, 2, and 3) $80,000 came from Irwin Trading GmbH (numbers 5 and 6) and the $5,000 check (number 4) was written on Irwin's personal checking account.

ever, that the $748,083 figure does not represent the profits of the business, but represents only the amount of money actually invested in the business by the various clients. Since that money was to be used only for investment purposes, it cannot be apportioned between Hayes and Irwin as profits. The defendant's argument is well taken.

The amounts invested by the numerous clients are the substance from which their profits would be realized, but these investments cannot be entered into a computation of either income or profit. Commissions and fees made on money received as investment from the investor after costs are deducted are the property of the broker, but money received only for investment is received in a fiduciary capacity and always remains the property of the investor. Hayes admits that he does not know what the profits of the business amounted to since Irwin has never given him a complete account of the business. He maintains that he is entitled to his share of this $748,083 figure since it represents a portion of the money that was taken into the business. The court will not allow money that is pure investment capital to be treated as profit that may be apportioned. It is the commissions made on the execution of the trades that constitutes the profits of a business, not money that is the base for generating commissions. The commissions made on the execution of the trades would be the appropriate figure to be used in calculating Hayes' allotted share of the profits. Hayes admits that he only used the $748,083 figure because he did not know what the profits were and that he used that figure because it was the base of whatever money would come into the company. That money is the capital from which income would flow resulting in profits, but it remains capital and nothing more; it cannot itself constitute an element for division.

The court cannot at this time calculate the amount of money due Hayes under the agreement to share the profits, since Irwin has never given Hayes a complete accounting of the profits and losses of the business, which is crucial in determining the gross income of the business. Irwin is hereby ORDERED to account to Hayes for the business in 1976; this accounting shall be provided within thirty days. After such accounting is rendered and the gross amount of income is determined, the court will apply the appropriate formula described above to calculate Hayes' share of the profits made by the partnership in 1976.

E. Count 6 (Breach of Duties as to Irwin Eurotrade Partnership)

This claim arises out of Hayes' partnership interest in Irwin Eurotrade Partnership, the entity established in Europe to do "cash and carry" transactions there. Irwin was managing partner and Hayes transferred his $6,000 interest in a personal account in Irwin Trading Company to become a partner in Irwin Eurotrade Partnership. In addition, Hayes was the trustee of various Georgia revocable grantor trusts which were also investors in the partnership.

■ As managing partner, Irwin carried out transactions for the partnership and performed other obligations pursuant to the partnership agreement, dated December 30, 1976, one of which was to provide adequate documentation regarding the activities carried out on behalf of the partnership. Irwin apparently has failed to comply with this provision of the agreement; furthermore, in a letter dated August 30, 1978, to C. B. Rogers, the plaintiff's counsel, Irwin claimed that he was no longer the managing partner. This letter was the first notification given to Hayes that Irwin had purportedly resigned his position. Any resignation without having made an accounting of the partnership was a violation of Irwin's obligation to properly manage the business. Irwin also transferred assets out of the partnership without authorization or notice to the other partners. Furthermore, Hayes testified that he has never received any return on his investment in Irwin Eurotrade Partnership.

Irwin is hereby ORDERED to supply complete documentation regarding any and all transactions entered into by Irwin Eurotrade Partnership from December 30, 1976,

through the date that this action was filed. Hayes also requests compensatory damages for the harm caused him by Irwin's mismanagement of his investment; however, without documentation of the transactions, any award of damages at this point would be speculative.

### F. Count 7 (Fraud)

This count of Hayes' complaint alleges that Irwin should be held liable for his fraudulent activities and representations to Hayes, including (1) his failure to account for the business in 1976 after repeatedly promising to do so, (2) his submission of inflated and inaccurate personal and business expense statements in order to understate the profits of the business, (3) his issuance of the warrant for Hayes' arrest in London premised on false charges, (4) his threats of litigation to Hayes over alleged sums of money due him which he knew were false, and (5) his refusal and failure to provide relevant documentation regarding the activities of the business.

In order to prevail on an action for fraud in Georgia, a plaintiff must show (1) that false representations were made by the defendant, (2) that the defendant knew of their falsity at the time of the representation, (3) that the representations were intended to deceive the plaintiff and induce him to act or refrain from acting, (4) that the plaintiff justifiably relied on the representations, and (5) that the plaintiff suffered damage as a result of his reliance. *See City Dodge, Inc. v. Gardner,* 232 Ga. 766, 208 S.E.2d 794 (1974); *Club Mediterranee v. Stedry,* 159 Ga.App. 53, 283 S.E.2d 30 (1981). Mere failure to comply with the promise to perform an act in the future is normally not actionable with respect to fraud, *Beach v. Fleming,* 214 Ga. 303, 104 S.E.2d 427 (1958), *Ely v. Stratoflex,* 132 Ga.App. 569, 208 S.E.2d 583 (1974); but a cause of action for fraud may arise when the failure to perform the promised act, even as to a future event, is coupled with a present intention not to perform. *Dye v. Dye,* 231 Ga. 533, 202 S.E.2d 418 (1973); *Cowart v. Gay,* 223 Ga. 635, 157 S.E.2d 466 (1967).

Hayes has cited no authority for his contention that either threats of litigation or a false arrest warrant constitutes fraud, and this court is not persuaded that they meet the required elements of fraud. Irwin's promises to account for the business, his inflation of business and personal expenses, and his promises and subsequent refusals to provide documentation of business transactions, however, are evidence of promises to perform in the future with an intent not to perform, which may constitute a cause of action for fraud. Irwin has never complied with his promises and apparently has no intention of ever doing so. Hayes has adequately demonstrated that he has been damaged by Irwin's failure to account for the business, since he has never received his allotted share of the profits. Irwin's inflation of expenses and his failure to document the transactions of the business have further contributed to Hayes' failure to receive his share of the profits. Accordingly, Irwin must be held liable under Count 7 for his fraudulent activities.

### G. Count 8 (Breach of Contract and Agency Agreements)

This count of Hayes' complaint relates to Irwin's and Irwin Trading GmbH's agreement to act as agents in executing transactions on behalf of the partners of Irwin Eurotrade Partnership. Pursuant to this agreement, these defendants were to keep accounts of all transactions and to provide full and accurate documentation of those transactions. The evidence at trial revealed that Hayes, as an individual partner in Irwin Eurotrade Partnership, has never received documentation of the transactions executed by Irwin and Irwin Trading GmbH. Although there appeared to be some acknowledgements from Irwin that confirmations of account transactions were mailed to Hayes, in Irwin's October 30, 1980, letter, discussed previously, Irwin claims that these documents were forged. Irwin is hereby ORDERED to provide in full the documents necessary to support the execution of trades on behalf of Irwin Eurotrade Partnership.

## IV. DAMAGES AND ATTORNEY'S FEES

This court has granted injunctive relief with respect to Counts 4, 6, and 8 of Hayes' complaint, ordering Irwin to account for the business done by the partnership in 1976, to provide full and accurate documentation regarding the activities of Irwin Eurotrade Partnership, and to provide full and accurate documentation for the trades executed on behalf of Irwin Eurotrade Partnership by Irwin and Irwin Trading GmbH. Hayes has not demonstrated any specific monetary amount incurred as damages from Irwin's failure to accomplish these acts, however, and any award of damages by this court at this time would be too speculative and remote. Similarly, this court is unable at this time to determine the correct amount of damages with respect to Count 5, requesting an award of one half of the profits of the business in 1976. After Irwin has complied with this order directing him to account for the business, Hayes will be awarded one half of the profits according to the formula as set out *infra*.

 With respect to Counts 1, 2, 3, and 7, however, an award of damages, both actual and punitive, is appropriate. Damages are given as compensation for the injury done; generally, this is the measure where the injury is of a character capable of being estimated in a dollar amount. Ga. Code Ann. § 105–2001. General damages are those that the law presumes to flow from a tortious act and may be recovered without proof of any amount. Ga.Code Ann. § 105–2006. The amount of damages that may be awarded is limited only by the sole discretion of the fact-finder. *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25 (5th Cir. 1973).

 Furthermore, in every tortious act there may be aggravating circumstances, either in the act or the intention. In that event, additional damages may be awarded either to deter the wrongdoer from repeating the tortious act or as compensation for the wounded feelings of the injured plaintiff. Although Ga.Code Ann. § 105–2002 does not speak of punitive damages, the additional damages allowed are what would commonly be called "punitive" in that they are in addition to compensatory damages and in that the award is based not on the extent of the plaintiff's injury but on the aggravated nature of the defendant's conduct. *Westview Cemetery, Inc. v. Blanchard*, 234 Ga. 540, 216 S.E.2d 776 (1975). To authorize punitive damages under Ga.Code Ann. § 105–2002, there must be evidence of willful misconduct, malice, fraud, wantoness, or oppression, or an entire want of care which would raise the presumption of a conscious indifference to the consequences of the tortious act. *Southern Ry. v. O'Bryan*, 119 Ga. 147, 45 S.E. 1000 (1903). Punitive damages may be awarded even though the actual injury is slight. *Batson v. Higgenbotham*, 7 Ga.App. 835, 68 S.E. 455 (1910). Under Ga.Code Ann. § 105–2002, damages are allowable either to deter the wrongdoer or to compensate for wounded feelings, but not both. *Johnson v. Morris*, 158 Ga. 403, 123 S.E. 707 (1924).

 In some torts, the entire injury is the peace, happiness, or feelings of the plaintiff; in these cases, the circumstances of parties, the amount of bad faith in the transaction, and all attendant facts are to be weighed in assessing damages. Ga.Code Ann. § 105–2003. This section does not create a cause of action for injury to peace, feelings, or happiness but prescribes the measure of recovery where such a cause of action exists. *Chapman v. Western Union Telegraph Co.*, 88 Ga. 763, 15 S.E. 901 (1882). If the mental pain and suffering is not accompanied by physical injury or pecuniary loss, recovery is allowed only if the conduct complained of was malicious, willful, or wanton. *Montega Corp. v. Hazelrigs*, 229 Ga. 126, 189 S.E.2d 421 (1972). An award of damages pursuant to both Ga. Code Ann. §§ 105–2002 and 105–2003 is prohibited, since it would in effect constitute a double recovery for the plaintiff. *Westview Cemetery v. Blanchard*, 234 Ga. 540, 216 S.E.2d 776 (1975).

With these principles in mind, the court must now assess the appropriate damages

in the instant case. With respect to Count 1, Irwin has been held liable for tortiously interfering with Hayes' business relationships, both current and prospective, by way of the anonymous mailing and numerous telephone calls to Hayes' clients. At least nine of Hayes' clients refused to transact any further business with him after receiving the anonymous mailing and receiving the telephone calls; another potential investor, Simeon Spear, requested that Hayes return certain subscription agreements for the formation of several limited partnerships after the anonymous mailing and after Spear talked with Touche Ross, which had been told by Irwin that Hayes was dishonest and lacked the appropriate business expertise.

The clients in Hayes' and Irwin's investment schemes normally invested approximately $10,000 each; in some cases, investors in the limited partnerships put up $20,000 each. However, $10,000 was the normal amount of an individual's investment in a limited partnership, option transaction, or revocable trust. Simeon Spear, who requested eight to ten subscription agreements for limited partnerships in Florida, would no doubt have invested approximately the same amount of money with Hayes, had it not been for his conversation with Touche Ross. Even though Hayes' and Irwin's investment business was relatively new, an estimate of their future business can be made on the basis of their clients' investments in the past. There were at least ten investors (including Spear) who had once or would have invested with Hayes and who subsequently refused to do business with him after receiving the anonymous mailing and the telephone calls at Irwin's direction. Since the normal investment has been calculated to be $10,000, this amounts to at least $100,000 in estimated business that Hayes would have brought into the partnership but for Irwin's interference. This court has ruled, however, that the amount of money invested in Hayes' and Irwin's enterprise does not constitute profit; it represents the capital from which profits are realized. Accordingly, this $100,000 of estimated investments can

not be the measure of an award of actual damage for estimated lost profits. The court is of the opinion that actual damages are warranted, however. In the commodities trading business, it is not unreasonable to assume that a broker could generate 10–20% profit for himself on the amount invested, especially if numerous trades were conducted, as is the case in the commodities and options markets. Since at least $100,-000 would have been invested in the partnership, Hayes could have been expected to receive approximately 15%, or $15,000, in brokerage fees. Accordingly, an award of $15,000 in actual damages is appropriate with respect to Count 1. Furthermore, Irwin's aggravated conduct and his malicious intent to destroy Hayes' business also authorize an award of punitive damages pursuant to Ga.Code Ann. § 105–2002. In light of his activities, this court is of the opinion that $185,000 in punitive damages is appropriate, since Irwin was consciously indifferent to the consequences of his acts. In sum, $200,000 in actual and punitive damages is awarded to Hayes for tortious interference with his business relations.

Irwin's responsibility for the anonymous mailing, the numerous telephone calls, the bogus lawsuit, and the October 30, 1980, letter gave rise to a finding of liability for defamation in Count 2 of Hayes' complaint. Under Georgia law, damages are incurred when false and defamatory statements are made in regard to another in his trade, office, or profession which are calculated to injure him. Ga. Code Ann. § 105–702; *Hood v. Dun & Bradstreet, Inc., supra.* Furthermore, malice, which is necessary to support an award of punitive damages, is inferred by law from the character of the defamation where there is an absence of lawful excuse or the absence of privilege. *See Hood v. Dun & Bradstreet, Inc., supra.* Irwin's defamatory acts were accomplished with the intent of maligning Hayes' character, business ability, and expertise. Given the malicious intent behind his behavior, this court is of the opinion that an award of $100,000 in punitive damages is warranted as a deterrent to

any future action of this sort anticipated by Irwin.

 The events surrounding Hayes' stay in London which underlie Count 3 of his complaint warrant an award of actual damages and punitive damages pursuant to Ga.Code Ann. § 105–2003. This court can imagine no better situation in which to award damages for insult, mortification, and humiliation. Georgia law provides that before recovery may be had for humiliation, the facts and circumstances must be such that they would likely humiliate and insult any person in similar circumstances. *Anderson v. Atlanta Newspapers, Inc.*, 212 Ga. 776, 95 S.E.2d 847 (1956). It appears to this court that any reasonable person who was forcibly taken from a hotel room, falsely charged with theft, forced to spend an unwarranted amount of time in jail in a foreign country, and made the subject of hearings in which the charging party failed to appear, would, undoubtedly be insulted and humiliated. Irwin has offered no excuse for his reprehensible acts in London and apparently is suffering no remorse over their effect on Hayes. To compensate Hayes in this regard, this court awards Hayes $5,000 in actual damages to cover costs incurred for his detention in London and $250,000 in vindictive damages pursuant to Ga.Code Ann. § 105–2003.

 With respect to the court's finding of fraud in Count 7 of the complaint, both actual and punitive damages are warranted and are allowable. *Shingleton v. Armor Velvet Corp.*, 621 F.2d 180 (5th Cir. 1980); *McMichen v. Martin Burks Chevrolet, Inc.*, 128 Ga.App. 482, 197 S.E.2d 395 (1973). Although a simultaneous award of some other type of damage is necessary to support an award of punitive damages, an award of even nominal damages is sufficient for this purpose. *Foster v. Sikes*, 202 Ga. 122, 42 S.E.2d 441 (1947). Irwin's false representations, discussed above, have had the result of preventing Hayes from receiving his allotted share of the business. Although an exact figure for this share of the profits is impossible to ascertain at this time, an award of $1,000 as nominal dam-

ages is justified by the facts presented. Furthermore, this court awards punitive damages in the amount of $150,000 for Irwin's fraudulent activities.

 Hayes' counsel has also requested an award of attorney's fees pursuant to Ga.Code Ann. § 20–1404, which provides: "The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." Bad faith which authorizes recovery of attorney's fees as expenses of litigation is defined as fraud or the bad faith of the defendant in the transaction out of which the cause of action arose. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974); *Southern Bell Telephone & Telegraph Co. v. C & S Realty Co.*, 141 Ga.App. 216, 233 S.E.2d 9 (1977). Furthermore, the willful violation of the rights of another involves the species of bad faith that will entitle the person wronged to recover the expenses of litigation, including attorney's fees. *Speir v. Williams*, 146 Ga.App. 880, 247 S.E.2d 549 (1978).

 The actions of Irwin during his relationship with Hayes are permeated with evidence of litigiousness and bad faith. The evidence of Irwin's schemes to destroy Hayes, his broken and unfulfilled promises, and his refusal to supply requested and necessary documentation of business transactions, combined with the total absence of excuse or privilege, necessitate an award of attorney's fees in this case. Such an award is further justified by Irwin's stubborn refusal to pay Hayes' claim of one half of the profits of the business, which resulted in the unnecessary trouble and expense of bringing this dispute to trial. It does not appear that a "bona fide controversy" existed between the parties, as evidenced by the record and by Irwin's failure to take the stand and defend himself against Hayes' claims. Irwin's actions during the pendency of this litigation, although not directly relevant to the causes of action presented at trial, are further evidence of his litigious

conduct and bad faith. He presented a fraudulent affidavit of a British attorney named Bruce Campbell in support of Irwin Trading GmbH's motion to quash service of process; Judge Edenfield ruled that this affidavit was false and was intended to perpetrate a fraud on the court. Irwin also attempted to transfer his interest in Irwin Trading GmbH by way of this fraudulent affidavit, containing the forged signature of Bruce Campbell. Finally, in an order dated January 11, 1978, Judge Edenfield enjoined both parties from "causing, directly or indirectly, any derrogatory written or oral communication to be made to any client or customer of, or persons standing in a business relationship to, any of them concerning any opposing party in this litigation." Irwin's letter of October 30, 1980, to all of the clients involved in the various Hayes Georgia limited partnerships, which contained various false and defamatory statements, was in direct violation of the court's order and is additional evidence of his bad faith.

Accordingly, counsel for the plaintiff are directed to submit the necessary motions and affidavits for an award of attorney's fees within 30 days of this order.

## CONCLUSION

After the defendant has complied with the directions in this order with respect to Count 5 and has produced the documentation relevant to Counts 4, 6, and 8, the clerk will be directed to enter judgment for the plaintiff, John Hayes, on Counts 1, 2, 3, 4, 5, 6, 7, and 8. Furthermore, the clerk will be directed to enter an award of $200,000 damages with respect to Count 1; $100,000 damages with respect to Count 2; $255,000 damages with respect to Count 3; and $151,000 damages with respect to Count 7.